15244

CREWS v. BEATTIE, SECRETARY OF STATE RURAL ELECTRIFICATION AUTHORITY *ET AL.*

(14 S. E. (2d), 351)

January, 1940.

34

*Mr. F. Ehrlich Thomson* and *Mr. E. W. Mullins,* for petitioner,

*Messrs. John M. Daniel,* Attorney General, *M. J. Hough* and *T. C. Callison,* Assistant Attorneys General, for respondents,

*Messrs. Marion B. Holman, Legare Walker, Thomas W. Lemmon, H. Wayne Unger, Lonnie D. Causey, Claude Emile Saint-Amand, T. W. Hunter, Ray R. Williams, L. Marion Gressette, Vincent D. Nicholson* and *Ernest L. Rushmer,* for respondents, Electric Co-operatives,

April 9, 1941.

The opinion of the Court was delivered by MR. ACTING ASSOCIATE JUSTICE G. B. GREENE.

On December 17, 1940, petitioner, a resident, freeholder and taxpayer of Richland County, South Carolina, presented his verified petition in the original jurisdiction of this Court asking for relief by way of injunction against respondents. Thereupon, Mr. Justice Baker signed an order requiring respondents to show cause before this Court at its regular January session why the prayer of the petition should not be granted. Respondents filed a demurrer to the petition and a return to the rule. Before a hearing of the matter was had nine co-operative associations, organized according to the provisions of Act No. 173 of Acts of 1939, 41 St. at Large page 240, upon their several petitions were allowed to intervene as respondents. All of them filed demurrers and returns similar to those filed by the original respondents.

For a clear understanding of the issues presented we are setting forth the pertinent parts of the several Acts of the General Assembly under which petitioner claims the right to the relief sought.

At its 1935 session the General Assembly passed an Act (Act No. 65 of the Acts of 1935, 39 St. at Large, p. 71), creating the "State Rural Electrification Authority of South Carolina." The pertinent parts of that Act follow:

"§ 5.—The corporate purpose of the authority is to encourage and promote the fullest possible use of energy by all of the inhabitants of the state by rendering service to said inhabitants to whom energy is not available or, in the opinion of the board, is not available at reasonable rates.

"§ 6.—The authority is hereby vested with all powers necessary or requisite for the accomplishment of its corporate purpose and capable of being delegated by the legislature of the state; and no enumeration of particular powers hereby granted shall be construed to impair any general grant of power herein contained, nor to limit any such grant

.to a power or·powers.of. the same class or classes as those so enumerated.

\* \* \*

"§ 8.—The authority shall have power and is hereby authorized from time to time to issue its bonds in anticipation of its revenues for any corporate purpose.

\* \* \*

"§ 10.—No holder or holders of any bonds issued under this Act shall ever have the right to compel any exercise of taxing power of the state or of any political subdivision thereof to pay said bonds or the interest thereon. Each bond issued under this Act shall recite in substance that said bond, including. the interest thereon, is payable from the revenues pledged to the payment thereof, and that said bond does not constitute a debt of the State.

"§ 11.—The authority shall not be operated for gain or profit or primarily as a source of revenue to the State. The authority shall, however, prescribe and collect reasonable rates, fees or charges for the services, facilities and commodities made available by it, and shall revise such rates, fees or charges from time to time whenever necessary so that the authority shall be and always remain self-supporting, and shall not ·require appropriations by the state to enable it to carry out its purpose. The rates, fees or charges prescribed shall· be such · as will produce revenue at least sufficient (a) to pay when due all bonds and interest thereon, for the payment of which such revenue is or shall have been pledged, charged or otherwise encumbered, including reserves therefor, and (b) to provide for all expenses of operation,. maintenance or improvement of the system or systems acquired by the authority including reserves therefor.

\* \* \*

"§ 13.—In connection with the issuance of bonds or in order to secure the payment of its bonds, the authority incorporated under this Act shall have power: (1) To pledge all or any part of its revenues. \* \* . \* (3) To take such

covenants and to do any and all such acts and things as may be necessary or convenient or desirable in order to secure its bonds or which, in the absolute discretion of the board, tend to make the bonds more marketable, notwithstanding that such covenants, acts and things may restrict or interfere with the exercise of the powers herein granted; it being the intention hereof to give the authority power to do all· things in the issuance of bonds, and for their security, that a private business corporation can do under the general laws of the state.

*　　*　　*

"§ 19.—The sum of twenty-five thousand dollars ($25,- 000.00) or so much thereof as may be necessary, is hereby appropriated to pay for the surveys herein authorized and other preliminary expenses of the authority until funds shall be obtained from the sale of bonds provided for under this Act, and the State of South Carolina shall be reimbursed by the authority for any advances made for such purposes.

"§ 20.—In the event that the authority shall cease to exist, all of its assets remaining after all of its obligations and liabilities have been satisfied or discharged shall pass to· and become the property of the State."

In 1936, 1937, 1938, 1939, and 1940 the General Assembly made appropriations aggregating $170,000.00 for expenses of the Authority. In 1940 by Act No. 962, 41 St. at Large, page 1847, an appropriation of $12,500.00 was made to be used by the Authority for the purpose of acquiring title to property and equipment necessary in the refrigeration and preservation of farm products. (The last-mentioned act became effective nine days after the "Williams Act" referred to below). No provision was made for the repayment of any of these appropriations.

At the 1940 session the General Assembly passed an Act (Act No. 1030 of the Acts of 1940, 41 St. at Large, page 2059), which is known as the "Williams Act." The pertinent parts of that Act will now be set out:

"Section 1 * * * (d) 'Outstanding funded indebtedness of the Authority' means the indebtedness of the Authority outstanding on the date to which reference is made evidenced by notes or bonds which by the terms thereof do not require payment in full within five (5) years after their respective dates and shall include accrued interest thereon unpaid on such date.

"§ 2.—It is hereby determined and declared to be the policy of the General Assembly of South Carolina that the furnishing of electric service to persons in rural areas of this State can be more effectively promoted and accomplished by Cooperatives than by the Authority.

"§ 3.—Any Cooperative may file in the office of the Secretary of the Authority an application for the transfer to such Cooperative of a part or parts of the Authority System. Such application shall be in writing, shall be executed on behalf of the Cooperative by an officer thereof and acknowledged before a notary public in the same manner as a deed of real property is required to be acknowledged, shall state that it is made pursuant to this Act, shall specify the name and address of the Cooperative and shall contain a general description of the part or parts of the Authority System the transfer of which is applied for therein. The Cooperative may amend or withdraw such application at any time prior to final action thereon.

"§ 4.—After a Cooperative has filed an application pursuant to Section 3, the Cooperative and the Authority shall agree upon the amount of the then outstanding funded indebtedness of the Authority to be assumed by the Cooperative in connection with the transfer of the part or parts of the Authority System the transfer of which is applied for, and shall execute and acknowledge an agreement which shall describe such part or parts of the Authority System, shall set forth the amount of the then outstanding funded indebtedness of the Authority to be assumed by the Cooperative in connection with such transfer, and

shall specify the notes or bonds, determined as provided in Section 6, by which such amount of the outstanding funded indebtedness of the Authority is evidenced.

"§ 5.—If the Cooperative and the Authority shall within thirty (30) days after the filing of the application be unable to agree upon the amount of the then outstanding funded indebtedness of the Authority to be assumed by the Cooperative and the other terms of the agreement, either the Cooperative or the Authority may request that the matter be submitted to arbitration by three arbitrators. One such arbitrator shall be appointed by the Cooperative, one by the Authority and one by the other two arbitrators. If either the Cooperative or the Authority shall fail to appoint an arbitrator within five (5) days after receiving a written request from the other so to do, the Governor of the State of South Carolina shall appoint such arbitrator. If the arbitrators appointed respectively by the Cooperative and the Authority shall fail within ten (10) days of the appointment of the second to be appointed to appoint the third arbitrator the Governor shall appoint the third arbitrator. The arbitrators so appointed shall find the amount of the outstanding funded indebtedness of the Authority to be assumed by the Cooperative in connection with the transfer of the part or parts of the Authority System the transfer of which is applied for in the Cooperative's application. Such amount shall be fair and reasonable having due regard for the then outstanding funded indebtedness of the Authority and the relative cost of such part or parts of the Authority System and of the remainder of the Authority System and shall be determined by the application of principles which, in the event of applications under this Act for the transfer of the entire Authority System, would result in the assumption by Cooperatives of the entire outstanding funded indebtedness of the Authority. The arbitrators shall also determine, in accordance with Section 6, the notes or bonds of the Authority evidencing such amount of the outstanding funded

indebtedness of the Authority and the extent to which each such note or bond evidences such amount or part thereof. Within sixty (60) days after the appointment of the third arbitrator to be appointed, the arbitrators shall file their findings in writing, signed and acknowledged by at least two of the arbitrators, with the Secretary of the Authority who shall immediately mail a copy of such findings by registered mail to the Cooperative. Such findings shall contain all statements required to be contained in an agreement executed pursuant to Section 4. The decision of two arbitrators shall be deemed to be the decision of all three. The expenses of arbitration shall be divided equally, between the Cooperative and the Authority.

\* \* \*

"§ 7.—If (1) the holder or holders of the notes or bonds evidencing that part of the total outstanding funded indebtedness of the Authority allocated to any Cooperative by an agreement between the Cooperative and the Authority, as provided in Section 4 or by a finding of arbitrators as provided in Section 5, and (2) the holder or holders of any other notes or bonds of the Authority secured by a mortgage or other lien upon the part or parts of the Authority System to be transferred to such Cooperative, or upon the revenues thereof, shall file in the office of the Secretary of the Authority an instrument or instruments discharging the Authority from any obligation to pay such part of the outstanding funded indebtedness of the Authority so allocated to such notes or bonds and agreeing that the assumption of such part of the outstanding funded indebtedness by, and the transfer of such part or parts of the Authority System to, such Cooperative shall have the effect provided in Section 9 hereof, then and in that event such part or parts of the Authority System shall be deemed to be transferred automatically to such Cooperative at noon standard time on the fifth day after the filing of such instrument or the last of such instruments to be filed, as the case may be.

\* \* \*

"§ 9.—Each Cooperative to which any part or parts of the Authority System shall be transferred pursuant to this Act shall become obligated in respect of the part of the outstanding funded indebtedness of the Authority allocated to such part or parts of the Authority System upon the terms expressed in the notes or bonds evidencing such indebtedness, or part thereof, with the same effect as though the Cooperative were the original obligor thereunder. Any part or parts of the Authority System transferred to any Cooperative pursuant to this Act shall be deemed to be mortgaged and pledged to secure the payment of the part of the outstanding funded indebtedness assumed by such Cooperative pursuant to this Act upon the same terms, covenants and provisions and subject to the same remedies as are expressed in the mortgage heretofore executed by the Authority to secure the outstanding funded indebtedness of the Authority in the same manner and to the same extent that such part or parts of the Authority System would be mortgaged if such Cooperative, to secure the part of the outstanding funded indebtedness of the Authority assumed by it pursuant to this Act, had executed a mortgage in the same terms covering only the part or parts of the Authority System transferred to it pursuant to this Act. Such lien shall be confined to the part or parts of the Authority System transferred to such Cooperative pursuant to this Act and shall not secure any part of the outstanding funded indebtedness of the Authority not assumed by such Cooperative. Any Cooperative may execute a new mortgage or mortgages to secure the part of the outstanding funded indebtedness of the Authority assumed by it."

Petitioner invoked the provisions of the foregoing Acts and alleged:

"4. That the State Rural Electrification Authority is now the owner of transmission lines and other property used in the transmission of electrical energy in most of the counties of South Carolina.

"5. That the said Authority has an outstanding funded indebtedness of approximately One Million Seven Hundred Thousand ($1,700,000.00) Dollars, payable in the amounts and at the times set forth in the several evidences of indebtedness; and that the payment of said indebtedness is secured by mortgages covering the said property of the Authority.

"7. That the said Authority purporting to act under said last-named Act (the Williams Act) proposes to transfer substantially all of its transmission lines to various cooperative associations, and that said Authority further proposes as a part of said transfer to apply all of the available cash on hand of said State Rural Electrification Authority upon indebtedness of said Authority which said indebtedness does not require payment in full within five years from date of issuance or to credit same on said obligations. That said funds according to the terms of Section 20 of the Act of 1935 amounting to approximately Ninety Thousand ($90,-000.00) Dollars is the property of the State of South Carolina and is not subject to be used by the said State Rural Electrification Authority for the purpose of retiring obligations which do not require payment within five years from date of respective issuance.

"8. That the respondents herein acting under and in pursuance of the State Rural Electrification Authority will proceed to apply the funds now on hand in the treasury of the said Authority to the payment of obligations of the Authority which do not require payment within five years from date of their respective issuance or to credit like amounts on the said obligations, thereby reducing the funded debt to be assumed by the cooperative association and leaving the Authority liable for such debt, contrary to the said Act providing for such transfers and in violation of law, and without legal authority, unless this Court do restrain such unlawful and unauthorized acts of the respondents; and that petitioner and others similarly situated have no adequate remedy at law.

"9. That the proposed acts of the respondents are without lawful authority and will result in loss to the State of South Carolina of approximately Ninety Thousand ($90,000.00) Dollars, and will result in the necessity of levying additional taxes upon the property of petitioner and others."

Petitioner asked: "That the respondents be permanently and forever enjoined and restrained from applying, paying or crediting any and all funds in the treasury or which may come into the treasury of the State Rural Electrification Authority to the payment of any obligation of said Authority which are not required to be paid in full within five years from the date of the issuance of said obligation, or to credit said funds upon said obligations; or to do anything whatsoever with said funds that would result in, or have the effect of, paying, crediting or applying such funds upon the obligations above described."

Respondents in both their demurrers and returns asked that the petition be dismissed upon the grounds:

1. Because the United States of America is a necessary party for a complete determination of the matter and it has not consented to be sued.

2. Because petitioner is without legal capacity to maintain this action.

3. Because the Authority, under its enabling statute, has the power to do all of the acts complained of and that this power is not limited by the provisions of the Williams Act.

4. Because the acts complained of are not in contravention of any established rule or principle of law or equity.

In their returns respondents alleged certain substantive facts that have not been controverted. All of these alleged facts were admitted in argument by all parties as being true. We shall now state such of these facts as we deem material.

The State Rural Electrification Authority, acting under the provisions of Act No. 65 of the Acts of 1935, entered into certain agreements or contracts with the United States of America, by which the United States of America ad-

vanced to the said Authority the sum of $1,962,922.61, said indebtedness being evidenced by notes and bonds of the said Authority, in the face amount of $2,053,328.00, secured by a supplemental indenture of mortgage, inter the said parties, dated November 15, 1937, whereby there was created a lien upon the physical properties of the Authority, as well as a lien upon all tolls, rents, issues, incomes, revenues, earnings, profits, benefits and additions derived, received or had from any and all property of the said Authority, of every other nature and description whether now owned or hereafter acquired, erected or constructed.

The funds of the Authority are held in three accounts as follows: A construction account, containing advances by the United States of America; a revenue account, containing revenues derived from the operation of the Authority system; and a general account containing funds from other sources.

By the terms of its mortgage the Authority covenants that "all moneys derived by the mortgagor from the operation of its properties shall be deposited in one or more banks or trust companies in a special account or accounts," and that such funds shall be withdrawn for the following purposes only and in the order named:

"(a) the payment of the principal and interest and other charges and obligations under bonds which shall be outstanding, the Resolutions and the Amended Mortgage;

"(b) the payment of all expense necessary to operate the properties of the mortgagor including operating charges, maintenance, upkeep and repairs;

"(c) twenty-five thousand ($25,000.00) dollars, for reserves for the foregoing; and

"(d) the payment of installments of principal of the bonds before the same shall become due."

Prior to the commencement of this action the Authority, purporting to act pursuant to the provisions of the Williams Act transferred to certain cooperative associations 811

miles of transmission lines owned by it and, in accordance with the provisions of that Act, the Authority has been discharged of $527,538.31 of its outstanding funded indebtedness. In making the transfers, above referred to, the Authority agreed with the transferees that the amount of the outstanding funded indebtedness to be assumed by each cooperative should be determined by first applying the cash in the said revenue and construction accounts of the Authority, plus all or any part of its accounts receivable to the reduction of the outstanding funded indebtednesss of the Authority, or deduct an amount equivalent thereto with a view to ultimately applying such cash to such reduction. The United States consented to such transfers and all of them have been consummated. Subsequently nine other cooperatives, the intervening respondents herein, filed applications for transfers to them of substantially all the remaining transmission lines now owned by the Authority. The Authority proposes to make transfers to them upon agreements similar to those upon which the other transfers were made.

Is the United States a necessary party here? Do the admitted facts show that a complete determination of the issues presented cannot be had in its absence? The petition relates to all funds of the Authority and necessarily includes the funds derived from revenues and deposited in the special revenue account and the balance in the special construction account lent by the United States and not used in the construction of lines. As a matter of fact, these are the only funds involved in this proceeding as appears from the returns and as assumed by counsel for all parties at the oral argument. These funds are specifically pledged to the United States as part security for its loans to the Authority. The funds in the construction account represent moneys advanced by the United States for the purpose of constructing electric lines, etc.; and, if such moneys had been used for that purpose, the United States would have had, under the terms of its mortgage, additional security for all moneys

advanced by it. Petitioner seeks to enjoin the application of the balance in the construction account to the outstanding funded indebtedness of the Authority and to divert it into the treasury of the State.

The Authority by covenant in its mortgage to the United States became bound to deposit all revenues from the operation of its properties in a special revenue account and to withdraw the funds in said account only for the purposes and in the order above set out. That enumeration is exclusive and such funds can be employed for no other purpose. After providing for the payment of the current debt service, operating expenses and a reserve of $25,000.00 for such purposes, the remainder of such special revenue account is impressed with a pledge for "the payment of installments of principal of the bonds before the same shall become due." It seems clear therefore that the United States is directly and vitally interested in any proceeding designed to prevent the Authority from making a voluntary payment in accord with said mortgage covenant.

Moreover, the United States gave its consent to the transfers already made after the Authority and the co-operatives had expresssly agreed that the outstanding funded indebtedness to be assumed by each co-operative should be determined by first applying the cash in the said revenue and construction accounts of the Authority, plus all or any part of its accounts receivable to the reduction of the outstanding funded indebtedness of the Authority, or deduct an amount equivalent thereto with a view to ultimately applying such cash to such reduction. Relying upon that agreement and upon the written assurance of the Authority that the same method of computation and procedure would be followed in respect to all transfers under the Williams Act, the United States consented to the transfers and to the novation contemplated by the Williams Act. Its position with respect to its securities has been materially changed. Our conclusion is that the relief sought cannot be granted in the

absence of the United States; and, as it has not consented to be sued, the petition must be dismissed. This conclusion is in accord with the decisions of this Court.

In *Columbia Water-Power Co. v. Columbia Electric Street Railway, Light & Power Co.,* 43 S. C., 154, 20 S. E., 1002, 1007, the State conveyed a canal and appurtenances to the plaintiff, reserving to itself the right to a certain amount of water power therefrom. The State subsequently leased to defendant the right to the use of such water power, in part consideration of defendant's agreement to deliver to the State Penitentiary a designated amount of electric power. Plaintiff sued to enjoin defendant from using a steam generating plant erected for stand-by purposes upon the land in question, and to recover damages for alleged trespass. The Attorney General, appearing specially, suggested that the State of South Carolina was a necessary party for the alleged reason that the stand-by plant was necessary to enable defendant to carry out its obligation to the State. He asked that the action be dismissed for want of consent of the State to submit to the jurisdiction of the Court.

This Court assumed jurisdiction of the action for damages on the law side of the Court since the rights of the State were not affected. The petition for an injunction, however, was dismissed on the ground that the State was an indispensable party. The Court said: "The complaint and the suggestion filed by the attorney general show that the state has interests which would be affected by granting the relief prayed for in the complaint. To grant such relief would have the effect of clogging the wheels of one of the branches of state government, to wit, its penitentiary."

In *Midland Timber Co. v. J. F. Prettyman & Sons,* 93 S. C., 13, 75 S. E., 1012, 1013, one Emma Heape had conveyed for a certain number of years with a right of renewal, certain timber rights which later became vested in the plaintiff. Plaintiff contracted to sell the rights to defendant which refused to accept a deed and complete the purchase

on the ground that there was doubt as to whether plaintiff had properly exercised its rights of renewal under the original deed from Heape. Although a determination of the case would not have been *res adjudicata* as to Heape and although neither party had raised the question of Heape's necessary joinder, this Court refused to take jurisdiction in the absence of Heape and remanded the case. The Court, after commenting that Emma Heape would not be bound by any judgment in the case, said: "At the same time we do not think we should determine this vital question as to the right of the parties to have the time extended, unless she is brought before the Court. She has a vital interest in this serious question. The suit is in the nature of a suit to require specific performance; and if this Court should determine this question it might seriously handicap her in any future litigation she might have with these parties, should the decision be contrary to her interests."

In *Green v. Niver,* 43 S. C., 359, 21 S. E., 263, 267, the plaintiffs sued to remove an alleged cloud upon title to land. They were heirs-at-law of one Green and claimed the land through a grant by the United States to Green, which grant provided a restraint against alienation for a period of years. Defendants claimed through a purported conveyance by Green. Among other questions was the contention that the deed to defendants was void because of alleged violation of the restraint upon alienation. If such were the fact, the title might have reverted to the United States for breach of a condition subsequent. In discussing the complaint because of absence of the United States as an indispensable party, this Court said: "It appears in the proceedings herein that the United States is an indispensable party, in order to have a complete determination of two questions arising out of this controversy: (1) Whether or not the manner in which the certificate of sale was obtained did not render it null and void; (2) Whether the conveyance of the property by Adam Green, Sr., did not work a forfeiture of his rights,

which inured to the benefit of his grantor, the United States. This objection may be raised at any time, and is jurisdictional in its nature."

Does petitioner have the legal capacity to maintain ■ this action? The general rule is that a taxpayer may not maintain a suit to enjoin the action of State officers when he has no special interest and his only standing is the exceedingly small interest of a general taxpayer. This doctrine is founded upon the salutary public policy of limiting the judicial process to real controversies between the parties to the proceeding. The mere fact that the issue is one of public importance does not confer upon any citizen or taxpayer the right to invoke *per se* a judicial determination of the issue. In the instant case petitioner has no special or peculiar interest to protect. The funds in question never accrued from taxation, but from the operation of an electric system by a public corporation created for the sole purpose stated in Section 5 of the Act of 1935 above set out.

Petitioner relies upon Section 20 of the Act of 1935 which provides: "In the event that the authority shall cease to exist, all of its assets remaining after all of its obligations and liabilities have been satisfied or discharged shall pass to and become the property of the State." The Authority has not ceased to exist and intends to carry on other activities even after transfers under the Williams Act shall have been completed. As stated in petitioner's brief (page 4), the General Assembly, after passage of the Williams Act, appropriated to the Authority $12,500.00 'for the purpose of acquiring title to property and equipment necessary in the refrigeration and preservation of farm products." The petitioner's interest as taxpayer is highly contingent, remote and infinitesimal. No monies can ever accrue to the State treasury until the Authority has ceased to exist and all of its obligations satisfied. Neither of these contingencies has happened or is contemplated. To grant this petitioner the right to sue would be to broaden the scope of taxpayers'

suits far beyond anything that has been recognized in this Court or in the Courts generally throughout the country.

In *Duncan et al. v. Heyward et al.,* 78 S. C., 227, 54 S. E., 760, 763, 58 S. E., 1095, a taxpayer sought to enjoin the members of the State Board of Education from entering into certain contracts. Although electing to consider the case on the merits, the Court assigned the following two reasons as among the grounds of its decision:

"2. The injury which the petitioners allege they would suffer does not differ in kind from that which would be suffered by the people at large patronizing the public schools, and, if there had been any cause of action, the suit should have been instituted by or on behalf of the State. *Manson v. Railroad Co.,* 64 S. C., 120, 41 S. E., 832, 834.

"3. But, aside from that, the personal interest of the petitioners is exceedingly small; it being impossible that it could amount to more than $5.00 or $6.00 each year. On the other hand, the plans devised by the state board of education for furnishing the books have been undertaken and carried almost to completion, and have presumably received full consideration with due solicitude for the public interest. The Court should therefore require the clearest showing not only of material injury to the petitioners, but also that the board of education has transcended its statutory powers."

The instant case presents much more cogent reasons for a similar action by the Court. In the *Duncan case* the funds had been derived from taxation; here no tax monies whatever are involved. The *Duncan case* involved the conduct of the usual governmental function of public education in which the plaintiffs alleged an interest as resident taxpayers and patrons; the instant case involves the operation of a public utility system for which the State has no financial responsibility and with which the plaintiff has no connection even as consumer.

In *Manson et al. v. South Bound R. Co. et al.*, 64 S. C., 120, 41 S. E., 832, 835, certain residents and taxpayers sought to enjoin condemnation of a park for a railroad station. This Court, reversing the lower Court, dismissed the petition on the ground that the plaintiffs, not having any special interest, were without legal capacity to sue. The Court quoted with approval Hightower on Injunctions as follows: "Sec. 1301. Although the general doctrine that taxpayers are proper parties to invoke equitable relief against misconduct upon the part of municipal authorities is thus seen to be well established, it is not to be understood that they are entitled to maintain an action in all cases of this nature, regardless of their personal interest, or of the degree of injury which they may sustain. * * * So a taxpayer in a city, who files a bill in behalf of himself and other taxpayers to enjoin the city from selling a public park or square, is not entitled to the relief when he has no land abutting upon the square, and when he has no private interest involved other than or different from the body of taxpayers."

The rule and the reasons therefor are stated by the United States Supreme Court in *Frothingham v. Mellon*, 262 U. S., 447, 43 S. Ct., 597, 601, 67 L. Ed., 1078, as follows:

" * * * The interest of a taxpayer of a municipality in the application of its moneys is direct and immediate and the remedy by injunction to prevent their misuse is not inappropriate. It is upheld by a large number of state cases and is the rule of this Court. *Crampton v. Zabriskie*, 101 U. S., 601, 609, 25 L. Ed., 1070, 1071. * * * The reasons which support the extension of the equitable remedy to a single taxpayer in such cases are based upon the peculiar relation of the corporate taxpayer to the corporation, which is not without some resemblance to that subsisting between stockholder and private corporation. * * * But the relation of a taxpayer of the United States to the federal government is very different. His interest in the

moneys of the treasury—partly realized from taxation and partly from other sources—is shared with millions of others, is comparatively minute and indeterminable, and the effect upon future taxation, of any payment out of the funds, so remote, fluctuating and uncertain, that no basis is afforded for an appeal to the preventive powers of a Court of Equity.

"The administration of any statute, likely to produce additional taxation to be imposed upon a vast number of taxpayers, the extent of whose several liability is indefinite and constantly changing, is essentially a matter of public and not of individual concern. If one taxpayer may champion and litigate such a cause, then every other taxpayer may do the same, not only in respect to the statute here under review, but also in respect of every other appropriation act and statute whose administration requires the outlay of public money, and whose validity may be questioned. The bare suggestion of such a result, with its attendant inconveniences, goes far to sustain the conclusion which we have reached, that a suit of this character cannot be maintained. * * *"

In every case cited by petitioner to support his right to maintain this action the plaintiff or petitioner had an immediate, direct and special interest in the matters involved.

In *Kirk v. Clark*, 191 S. C., 205, 4 S. E. (2d), 13, 15, the plaintiff was the holder of certain municipal bonds and sought to prevent an alleged misapplication of tax funds levied and collected for the specific purpose of paying the interest on such bonds. In that case this Court, speaking through Mr. Justice Fishburne, said: "The holder of such bonds has a direct and peculiar interest in the preservation and lawful administration of such a fund, and may maintain a suit, when his rights as a bondholder will be injuriously affected, for the purpose of enjoining the diversion or threatened diversion of public funds dedicated to the payment of his bonds."

In *Sligh v. Bowers,* 62 S. C., 409, 40 S. E., 885, the plaintiffs were patrons of a school district and as such sought to enjoin an alleged unlawful location of a school building. Plaintiffs as patrons of the school had a special interest in the location of the school building; and, too, the case involved the well-established distinction between resident taxpayers of a municipality whose interest in municipal services is necessarily a substantial one, and, on the other hand, the very remote and minute interest of a general taxpayer who has no special or peculiar interest.

*Mauldin v. City Council of Greenville,* 33 S. C., 1, 11 S. E., 434, 8 L. R. A., 291, was a suit by resident taxpayers of a municipality to restrain an illegal issue of tax-secured bonds.

*McCullough v. Brown,* 41 S. C., 220, 19 S. E., 458, 23 L. R. A., 410, was a suit by taxpayers of a county to restrain county officials from establishing a liquor dispensary under the so-called "Dispensary Act." The use of tax monies was directly involved and the interest of the taxpayers in the activities of their county officials was "direct and immediate."

Our conclusion is that petitioner is without legal capacity to maintain this action.

As we have reached a definite conclusion as to the merits of the controversy and as our conclusion cannot in any way prejudice the rights or interests of the United States, we are going to assume that petitioner has the right to maintain this action and state our conclusion together with the reasons therefor. In passing upon the merits of the case the determining question is whether or not the Authority has the right and power to apply the funds in question in accordance with the agreements upon which it has since the passage of the Williams Act already made transfers of its properties and now proposes to transfer the remainder thereof.

First, let us determine the powers of the Authority
■ under its enabling Act. In the case of *Woodward v.
State Rural Electrification Authority* (1939), 190
S. C., 465, 3 S. E. (2d), 539, this Court held that the Authority had power to sell a portion of its electric lines to
a co-operative association. There can be no doubt that the
Authority, within its discretion, may make voluntary payments in anticipation of indebtedness not yet due. This common power of any debtor (assuming the consent of the
creditor) would undoubtedly be vested in the Authority
without any relevant provisions in its enabling Act. This
Act, however, provides that the Authority have power "to
do all things in the issuance of bonds, and for their security, that a private business corporation can do under
the general laws of the state." This discretionary power to
anticipate payments of indebtedness not yet due was converted into a contractual obligation by the covenant in the
mortgage to the United States quoted above which provided that after the payment of certain items the surplus
funds in the revenue account should be employed in "the
payment of installments of principal of the bonds before
the same shall become due." So it will appear that the Authority under its enabling Act had power to do all of the
things complained of in the petition herein.

A study of the Williams Act will show that it was
■ intended only to provide a means whereby co-operatives might compel transfers of property of the Authority. It was an enabling Act for co-operatives; not an Act
of limitation upon the Authority. In fact, Section 4 of that
Act in effect reserves to the Authority all of its former
powers, except for the minor restriction that the notes or
bonds allocated to the various co-operatives should be taken
in the chronological order of their issuance. There is no language in any section of the Act which expressly or impliedly
limits the powers already possessed by the Authority to enter
into voluntary transactions. In this connection it is impor-

tant to note that there is not here involved any issue arising under Section 5 of the Act which provides for arbitration in the absence of agreement and sets forth the things which the Authority can be compelled to do. We are concerned here only with voluntary agreements and with the question as to whether Section 4 limits in any way the powers which the Authority otherwise possesses. There is nothing in the language of Section 4 which prevents, even by strained implication, the exercise by the Authority of its powers under its enabling Act to deal with its accumulated revenues in the manner proposed. In the event that the Authority elects to proceed by voluntary agreement rather than by arbitration, this section of the Act provides that "the Cooperative and the Authority shall agree upon the amount of the then outstanding funded indebtedness of the Authority to be assumed by the Cooperative." There is nothing in that section which says or implies that the sum total of all such agreements shall equal the total outstanding indebtedness without reference to funds in the hands of the Authority pledged to the payment of such indebtedness. Such a construction might be placed on Section 5 of the Act where the Authority may be compelled to make transfers through arbitration. It is obvious that said provision was there made for the protection of the Authority while acting under compulsion. It is our opinion therefore that the Williams Act so far as concerns voluntary agreements leaves the Authority exactly in the position it would occupy apart from that Act and that the transactions challenged by the petitioner are not unlawful.

It is, therefore, ordered that the temporary restraining order herein signed by Mr. Justice Baker on December 18, 1940, be, and the same is hereby, dissolved; and that the petition herein be, and the same is hereby, dismissed.

MR. CHIEF JUSTICE BONHAM and MESSRS. JUSTICES CARTER, BAKER and FISHBURNE concur.