590 S.E.2d 338

**Edward D. SLOAN, Jr., individually, and as a Citizen, Resident, Taxpayer and Registered Elector of Greenville County, and on behalf of all others similarly situated, Appellant/Respondent,**

v.

**GREENVILLE COUNTY, a Political Subdivision of the State of South Carolina, Dozier Brooks, Scott Case, C. Wade Cleveland, Bob Cook, Joseph Dill, Lottie Gibson, Allen "Bunk" Johnson, Mark C. Kingsbury, Xanthene Norris, Stephen Selby, and Dana Sullivan, Paul B. Wickensimer in their official capacity as Greenville County Council Members, Respondents/Appellants.**

No. 3704.

Court of Appeals of South Carolina.

Heard Nov. 5, 2003.

Decided Dec. 8, 2003.

Jennifer J. Miller and James G. Carpenter, of Greenville, for Appellant–Respondent.

Boyd B. Nicholson, Jr. and Thomas H. Coker, Jr., of Greenville, for Respondents–Appellants.

ANDERSON, J.

Edward D. Sloan, Jr., individually, and as a citizen, resident, taxpayer and registered elector of Greenville County, and on behalf of all others similarly situated, brought this action against Greenville County alleging it failed to comply with county ordinances governing the procurement of construction services when it awarded contracts for the completion of three public works projects. The trial court ruled the procurement processes met the statutory standard with respect to two of these projects, while the third project did not. Both Sloan and the County appeal. We affirm.

## FACTS/PROCEDURAL BACKGROUND

The Greenville County Code ("G.C.C." or "the Code") prescribes the methods the County may use to award contracts for construction services. As a general rule, the code requires that all contracts must be awarded by the "competitive sealed bidding" method. G.C.C. § 7–212. This method of source selection proceeds in multiple stages. The County must first hire an architect or other design professional to prepare the initial plans and specifications for the new construction project. After the County has approved these initial plans, the design professional will typically draft a detailed set of construction drawings and specifications that will become part of a "bid package." The County will then use the bid package to publicly solicit bids from contractors to perform the work. The lowest responsible, responsive bidder is awarded the project.

Under the Code, the County must use the competitive sealed bidding method to procure construction services over $15,000 unless one of several specific exceptions applies. *See* G.C.C. §§ 7–212—7–242.5. One of these exceptions—the focal

point of this case—is known as the "design-build" procurement method.[1] *See* § 7–242.5.

The design-build method differs from traditional competitive sealed bidding in two important ways. First, under the design-build method, the County enters into a single contract for design and construction of the project. This arrangement condenses the two-step process of competitive sealed bidding in which the County procures design services and then contracts separately for the actual construction. Design-build's single source procurement also enables design and construction to proceed concurrently, thereby shortening project duration. Once a design "footprint" for a structure has been prepared, a contractor may begin work such as grading and excavating a site, while a designer continues to design the structure.

Second, the design-build method allows comparative subjective evaluations to be made when determining acceptable proposals for negotiation and award of the contract. Price need not be the sole or primary criterion for evaluating competing proposals—it may be only one of several factors considered. The County may select the design-build team based on other factors such as experience, project team members, and expertise.

It is design-build's lack of objective, bright-line criteria that raises concerns about its use. Critics espouse that design-build vests too much discretion with the governing body regarding when and to whom public contracts are awarded. Because price is not a controlling factor in design-build source selection, the public entity may not always receive the lowest, most competitive price possible. *See e.g., Sloan v. Sch. Dist. of Greenville County,* 342 S.C. 515, 521, 537 S.E.2d 299, 302 (Ct.App.2000) (opining that "[t]his court has long maintained that '[m]unicipal competitive bidding laws are enacted to guard against such evils as favoritism, fraud or corruption in the award of contracts, to secure the best product at the

---

1. Professionals in the field of public procurement variously refer to this method of source selection as "design-build," "competitive sealed proposal," or "request for proposal." Though these terms are generally interchangeable, for ease of reference, we will refer exclusively to "design-build" when discussing this alternative to traditional competitive sealed bidding procurement.

lowest price' "). Without proper guidelines and oversight, design-build may foster the impression that the government is somehow less accountable for its decisions as to how it spends taxpayer money.

For these reasons, the use of design-build is limited under the Code to those situations in which it is properly justified. Greenville County's design-build ordinance sets out when it may be used:

> The county administrator or his designee shall have the discretion to use construction management services, design-build services, or turnkey management services as alternatives for construction contracting administration. In exercising such discretion, the county administrator or his designee shall consider the method which is the most advantageous to the county and will result in the most timely, economical, and successful completion of the construction project. The determination for the method of source selection utilized shall be stated in writing and included as part of the contract file.

G.C.C. § 7–242.5(a). The County's discretion to use design-build instead of competitive sealed bidding source selection is therefore limited to those occasions when it is in the best interests of the County—a determination that must be in writing and available for public consumption in the contract file.

At issue before us is whether Greenville County properly justified its decision to use the design-build method to award three multi-million dollar construction contracts. Specifically, we must decide whether the written determinations were sufficient under section 7–242.5 of the Code.

### The Construction Projects

The contracts for the three construction projects were awarded in 1999 and 2000. Construction services for all three were obtained using the design-build method.

Two of these contracts were for road-building projects that were part of a special infrastructure improvement program called the "Prescription for Progress" plan. This plan, approved by Greenville County Council in 1997, called for the expenditure of eighteen million dollars for the repair and

resurfacing of approximately 148 lane miles on more than 400 county roads through the year 2010. The two projects at issue are Prescription for Progress road improvement programs for years 2000 and 2001 (hereinafter referred to as the "Roads 2000" and "Roads 2001" projects). For the Roads 2000 project, the County procured $6,759,100 of road construction services. In the Roads 2001 project, the County obtained $12 million in road construction services.

The third construction contract was for the renovation of the criminal forensics lab at the County's law enforcement center in 1999. The County procured $290,000 in construction services to complete this project.

## This Action

After each of these contracts was awarded, Sloan brought suit seeking declaratory and injunctive relief, contending the procurements violated the Code. The primary issue—common to all three cases—was the validity of the County's determination to use design-build source selection rather than competitive sealed bidding in awarding the contracts. As additional causes of action, Sloan asserted the County did not obtain sufficient performance and payment bonds for the Roads 2000 project, and he claimed the Forensics Lab contract did not properly define the responsibilities and rights of the parties, both in violation of the Greenville County Code. In answering Sloan's charges, the County asserted the cases were not justiciable because Sloan did not have standing to challenge the County's actions and the questions presented were moot, preventing the court from awarding any effective relief.

The trial court consolidated the three cases for trial. The court decided these actions were properly justiciable—ruling that Sloan had standing to bring suit and the case was not subject to dismissal for mootness. With respect to the validity of the written determinations to use design-build source selection, the court deemed the determinations for the Roads 2000 and Roads 2001 projects were sufficient under the Code. It pronounced, however, the written determination for the Forensics Lab project did not satisfy the Code's requirements. As to the other claims asserted: The court adjudged the County had failed to obtain sufficient bonds for the Roads

2000 project. It found the Forensics Lab contract sufficiently defined the rights and duties of the parties.

## STANDARD OF REVIEW

■ The County contends this court should apply an "any evidence" standard of review rather than a "preponderance of the evidence" standard. We disagree.

■ In actions at law, on appeal of a case tried without a jury, the lower court must be affirmed where there is any evidence which reasonably supports the judge's findings. *Strickland v. Prudential Ins. Co. of Am.*, 278 S.C. 82, 85, 292 S.E.2d 301, 303 (1982); *Townes Assocs., Ltd. v. City of Greenville*, 266 S.C. 81, 86, 221 S.E.2d 773, 775 (1976); *Campbell v. Marion County Hosp. Dist.*, 354 S.C. 274, 280, 580 S.E.2d 163, 165 (Ct.App.2003). In an action in equity, however, the appellate court may "find facts in accordance with its views of the preponderance of the evidence." *Townes Assocs.*, 266 S.C. at 86, 221 S.E.2d at 775; *Kiriakides v. Atlas Food Sys. & Serv.*, 338 S.C. 572, 581, 527 S.E.2d 371, 376 (Ct.App.2000).

■ "A suit for declaratory judgment is neither legal nor equitable, but is determined by the nature of the underlying issue." *Doe v. South Carolina Med. Malpractice Liab. Joint Underwriting Ass'n*, 347 S.C. 642, 645, 557 S.E.2d 670, 672 (2001); *Felts v. Richland County*, 303 S.C. 354, 355, 400 S.E.2d 781, 781 (1991); *Travelers Indem. Co. v. Auto World of Orangeburg*, 334 S.C. 137, 140, 511 S.E.2d 692, 694 (Ct.App. 1999). The fact that Sloan seeks equitable relief does not, however, require the case be treated as an equitable action in toto. Rather, we must look to the "main purpose" of the suit to determine its characterization. *Williams v. Wilson*, 349 S.C. 336, 340, 563 S.E.2d 320, 322 (2002); *Ins. Fin. Servs., Inc. v. South Carolina Ins. Co.*, 271 S.C. 289, 293, 247 S.E.2d 315, 318 (1978); *see also Floyd v. Floyd*, 306 S.C. 376, 380, 412 S.E.2d 397, 399 (1991) (As we interpret the main purpose rule, its primary function is to administratively categorize an action in which parties seek both equitable relief and legal redress.); *Alford v. Martin*, 176 S.C. 207, 212, 180 S.E. 13, 15 (1935) ("The character of an action is determined by the complaint in its main purpose and broad outlines and not merely by allegations that are merely incidental."). The main purpose of

the action is generally discerned from the body of the complaint. *Ins. Fin. Servs.*, at 293, 247 S.E.2d at 318; *see also Nat'l Bank of South Carolina v. Daniels*, 283 S.C. 438, 440, 322 S.E.2d 689, 690 (Ct.App.1984) (noting that whether an action is legal or equitable must be determined from the character of the action as framed in the complaint). However, if necessary, resort may be had to the prayer for relief and any other facts and circumstances which throw light upon the main purpose of the action. *Id.; see also Doe v. South Carolina Med. Malpractice Liab. Joint Underwriting Ass'n*, 347 S.C. 642, 645, 557 S.E.2d 670, 672 (2001) (finding the main purpose of an action was equitable in nature where both injunctive relief and money damages were sought, but plaintiff offered no proof of damages at trial and no damages were awarded by the court); *Bramlett v. Young*, 229 S.C. 519, 534–35, 93 S.E.2d 873, 881 (1956) (examining the substance of the pleadings throughout the case and the evidence introduced at trial in its determination whether the action sounded in law or equity).

Although the County asserts the main purpose of this action is to construe a written contract, it seems clear that Sloans main concern is to enjoin the County from awarding contracts in a manner he claims is *ultra vires* under the Countys procurement code. Sloan brought this action as a citizen and taxpayer of Greenville County, not as a private individual seeking redress under the terms of a particular contract. In his complaint, Sloan only requested a declaration that the contracts were illegal and should be set aside. At trial, the testimony introduced concerned only the sufficiency of the Countys determination that design-build was the proper method of source selection for the construction projects. Sloan did not pray for damages in his pleadings, and the court awarded none. Indeed, by the time the case reached trial, the projects at issue had already been completed. The gravamen of the action, therefore, is merely to prevent the County from awarding future public works contracts in the manner employed in the present case.

A case with legal and equitable issues presents a divided scope of review. *Perry v. Heirs at Law Distributees of Gadsden*, 313 S.C. 296, 437 S.E.2d 174 (Ct.App.1993), *affd. as modified*, 316 S.C. 224, 449 S.E.2d 250 (1994). When legal

and equitable actions are maintained in one suit, each retains its own identity as legal or equitable for purposes of the applicable standard of review on appeal. *Corley v. Ott*, 326 S.C. 89, 485 S.E.2d 97 (1997); *Future Group, II v. Nationsbank*, 324 S.C. 89, 478 S.E.2d 45 (1996); *Kuznik v. Bees Ferry Assocs.*, 342 S.C. 579, 538 S.E.2d 15 (Ct.App.2000), *cert. granted* July 3, 2001. A legal question in an equity case receives review as in law. *Gunter v. Fallaw*, 78 S.C. 457, 59 S.E. 70 (1907); *Garvin v. Garvin*, 55 S.C. 360, 33 S.E. 458 (1899). Even if a case is tried in equity if it is actually a law case, the appellate court will apply the scope of review in law cases. *Brooks v. Cent. Baptist Church*, 185 S.C. 200, 193 S.E. 326 (1937).

 This action is appropriately characterized as equitable and should be reviewed under the preponderance of the evidence standard. Our broad scope of review, however, does not require this court to disregard the findings of the trial judge who saw and heard the witnesses and was in a better position to judge their credibility. *See Pinckney v. Warren*, 344 S.C. 382, 544 S.E.2d 620 (2001); *Ingram v. Kasey's Assocs.*, 340 S.C. 98, 105, 531 S.E.2d 287, 291 (2000); *Greer v. Spartanburg Technical Coll.*, 338 S.C. 76, 79, 524 S.E.2d 856, 858 (Ct.App.1999).

## LAW/ANALYSIS

### I. JUSTICIABILITY OF SLOAN'S CLAIMS

We first examine whether Sloan's causes of action were properly justiciable. The County challenges Sloan's standing to bring suit and asserts the issues raised present no actual controversy and are therefore moot. We address each seriatim.

 Before any action can be maintained, a justiciable controversy must be present. *Byrd v. Irmo High School*, 321 S.C. 426, 430, 468 S.E.2d 861, 864 (1996). A justiciable controversy is a real and substantial controversy appropriate for judicial determination, as opposed to a dispute or difference of a contingent, hypothetical or abstract character. *Waters v. South Carolina Land Res. Conservation Commn.*, 321 S.C. 219, 227, 467 S.E.2d 913, 917–18 (1996); *S. Bank and*

*Trust Co. v. Harrison Sales Co., Inc.,* 285 S.C. 50, 51, 328 S.E.2d 66, 67 (1985); *Charleston County Sch. Dist. v. Thomas,* 277 S.C. 145, 146, 283 S.E.2d 441, 442 (1981); *see also Graham v. State Farm Mut. Auto. Ins. Co.,* 319 S.C. 69, 71, 459 S.E.2d 844, 845 (1995) (A justiciable controversy exists when a concrete issue is present, there is a definite assertion of legal rights and a positive legal duty which is denied by the adverse party.). The concept of justiciability encompasses the doctrines of ripeness, mootness, and standing. *Holden v. Cribb,* 349 S.C. 132, 137, 561 S.E.2d 634, 637 (Ct.App.2002).

### A. Standing

▆▆ The County argues the trial court erred in holding Sloan had standing to challenge the County's award of the contracts. We disagree.

▆▆▆ A plaintiff must have standing to institute an action. *Joytime Distribs. & Amusement Co., Inc. v. State,* 338 S.C. 634, 639, 528 S.E.2d 647, 649 (1999). "To have standing, one must have a personal stake in the subject matter of the lawsuit." *Sea Pines Ass'n for the Prot. of Wildlife, Inc. v. South Carolina Dep't of Natural Res.,* 345 S.C. 594, 600, 550 S.E.2d 287, 291 (2001); *Evins v. Richland County Historic Pres. Comm'n,* 341 S.C. 15, 21, 532 S.E.2d 876, 879 (2000); *Newman v. Richland County Historic Pres. Comm'n,* 325 S.C. 79, 82, 480 S.E.2d 72, 74 (1997). "To have standing . . . one must be a real party in interest. A real party in interest is one who has a real, material, or substantial interest in the subject matter of the action, as opposed to one who has only a nominal or technical interest in the action." *Charleston County Sch. Dist. v. Charleston County Election Comm'n,* 336 S.C. 174, 181, 519 S.E.2d 567, 571 (1999) (quoting *Anchor Point, Inc. v. Shoals Sewer Co.,* 308 S.C. 422, 428, 418 S.E.2d 546, 549 (1992)); *see also Henry v. Horry County,* 334 S.C. 461, 463 n. 1, 514 S.E.2d 122, 123 n. 1 (1999) ("To have standing, one must be a real party in interest."); *Baird v. Charleston County,* 333 S.C. 519, 530, 511 S.E.2d 69, 75 (1999). Our supreme court has consistently held:

A private individual may not invoke the judicial power to determine the validity of an executive or legislative act unless the private individual can show that, as a result of

that action, a direct injury has been sustained, or that there is immediate danger a direct injury will be sustained.

*Joytime Distribs.,* 338 S.C. at 639, 528 S.E.2d at 649–50; *see also Evins,* 341 S.C. at 21, 532 S.E.2d at 879; *Citizens for Lee County, Inc. v. Lee County,* 308 S.C. 23, 29, 416 S.E.2d 641, 645 (1992); *Blandon v. Coleman,* 285 S.C. 472, 475, 330 S.E.2d 298, 299 (1985); *Florence Morning News v. Bldg. Comm'n,* 265 S.C. 389, 398, 218 S.E.2d 881, 884–85 (1975); *Carolina Alliance for Fair Employment v. South Carolina Dep't of Labor, Licensing, & Regulation,* 337 S.C. 476, 486, 523 S.E.2d 795, 800 (Ct.App.1999). "Moreover, the injury must be of a personal nature to the party bringing the action, not merely of a general nature which is common to all members of the public." *Joytime Distribs.,* 338 S.C. at 639–40, 528 S.E.2d at 650; *see also Quality Towing, Inc. v. City of Myrtle Beach,* 340 S.C. 29, 34, 530 S.E.2d 369, 371 (2000); *Baird,* 333 S.C. at 530, 511 S.E.2d at 75.

"[T]he rule [of standing] is not an inflexible one." *Thompson v. South Carolina Comm'n on Alcohol & Drug Abuse,* 267 S.C. 463, 467, 229 S.E.2d 718, 719 (1976). Standing may be conferred upon a party "when an issue is of such public importance as to require its resolution for future guidance." *Baird,* 333 S.C. at 531, 511 S.E.2d at 75; *Carolina Alliance,* 337 S.C. at 488, 523 S.E.2d at 801; *see also Charleston County Parents for Pub. Schs., Inc. v. Moseley,* 343 S.C. 509, 513, 541 S.E.2d 533, 535 (2001) (noting that an action to determine whether a school district could impose a tax levy was an issue of public importance sufficient to confer standing); *Thompson v. South Carolina Commn. on Alcohol Drug Abuse,* 267 S.C. 463, 467, 229 S.E.2d 718, 719 (1976) (holding the plaintiffs had standing because the questions involved were of such wide concern, both to law enforcement personnel and to the public); *Berry v. Zahler,* 220 S.C. 86, 89, 66 S.E.2d 459, 461 (1951) (holding the question of public interest originally encompassed in an action should be decided for future guidance).

The general rule is that a taxpayer may not maintain a suit to enjoin the action of State officers when he has no special interest and his only standing is the exceedingly small interest of a general taxpayer. This doctrine is founded upon the salutary public policy of limiting the

judicial process to real controversies between the parties to the proceeding. The mere fact that the issue is one of public importance does not confer upon any citizen or taxpayer the right to invoke per se a judicial determination of the issue.

*Crews v. Beattie,* 197 S.C. 32, 49, 14 S.E.2d 351, 357–58 (1941). For a plaintiff to have taxpayer standing, the party must demonstrate some overriding public purpose or concern to confer standing to sue on behalf of her fellow taxpayers. *Beaufort County v. Trask,* 349 S.C. 522, 529, 563 S.E.2d 660, 664 (Ct.App.2002).

■■■■ A party seeking to establish standing must prove the "irreducible constitutional minimum of standing," which consists of three elements: (1) the plaintiff must have suffered an injury in fact; (2) the injury and the conduct complained of must be causally connected; and (3) it must be likely, rather than merely speculative, that the injury will be redressed by a favorable decision. *Sea Pines Ass'n,* 345 S.C. at 601, 550 S.E.2d at 291 (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)); *see also Beaufort Realty Co., Inc. v. Beaufort County,* 346 S.C. 298, 551 S.E.2d 588 (Ct.App.2001) ("The United States Supreme Court has established the following requirements to show standing: (1) the plaintiff must suffer an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.").

The present case is analogous to this court's decision in *Sloan v. School District of Greenville County,* 342 S.C. 515, 537 S.E.2d 299 (Ct.App.2000), in which the court examined taxpayer standing on largely similar facts. In *Sloan,* the plaintiff brought an action against the school district seeking a declaratory judgment that the district violated its procurement regulations by entering into construction contracts without following the prescribed competitive sealed bidding procedure. *Id.* at 517–18, 537 S.E.2d at 300. The contracts at issue had been awarded under an exception which allowed the district to award contracts without competitive sealed bidding when there was an emergency need for the procurement of

construction and other services. *Id.* at 517, 537 S.E.2d at 300. The plaintiff challenged the district's determination that the procurement without competitive sealed bidding was justified under this exception. *Id.* at 518, 537 S.E.2d at 300. As in the case *sub judice*, the plaintiff had no private interest in the contracts and had not submitted a bid for the construction work. *Id.*

The court first held the plaintiff had standing to sue as an individual taxpayer, finding the plaintiff, as a taxpaying citizen of Greenville County, had "a direct interest in the proper use and allocation of tax receipts by the District." *Id.* at 522, 537 S.E.2d at 303. The court grounded its reasoning on the rationale articulated by our supreme court in *Mauldin v. City Council of Greenville*, 33 S.C. 1, 11 S.E. 434 (1890), a case challenging the government's expenditure of public funds. There, the court held:

> The injury charged as the result of the acts complained of is a private injury, in which the tax-payers of the county ... are the individual sufferers, rather than the public. The people out of the county bear no part of the burden; nor do the people within the county, except the tax-payers, bear any part of it. It is therefore an injury peculiar to one class of persons, namely the tax-payers of the county.

*Id.* at 20, 11 S.E. at 436 (quoted in *Sloan*, 342 S.C. at 519, 537 S.E.2d at 301).

The court decreed the plaintiff had standing because the question presented was of such substantial public importance as to warrant a resolution for future guidance. *Sloan*, 342 S.C. at 522–24, 537 S.E.2d at 303–304. The court noted, "the public interest involved is the prevention of the unlawful expenditure of money raised by taxation." *Id.* at 523, 537 S.E.2d at 303. With specific regard to procurement of services for public works projects, the court opined:

> The expenditure of public funds pursuant to a competitive bidding statute is of immense public importance. Requiring that contracts only be awarded through the process of competitive sealed bidding demonstrates the lengths to which our government believes it should go to maintain the public's trust and confidence in governmental management of public funds. The integrity of the competitive sealed

bidding process is so important that in some states "once a contract is proved to have been awarded without the required competitive bidding, a waste of public funds [is] presumed ... without showing that the municipality suffered any alleged injury."

*Id.* at 524, 537 S.E.2d at 303 (alteration in original) (quoting 18 Eugene McQuillin, *The Law of Municipal Corporations* § 52.26 (3d ed.1993)).

We find the court's reasoning in *Sloan* compels the same result in the case at bar. Here, Sloan's interest as a taxpayer in how public funds were spent is virtually identical. The projects were large and altogether required the expenditure of millions of taxpayer dollars. This burden was borne exclusively by the taxpaying citizens of Greenville County. Sloan, therefore, had a real, material, and substantial interest in whether the County followed the procurement procedures set out in the county code—procedures specifically designed to ensure wise management of the public fisc.

The issue in the present case is also of sufficient public importance to confer standing. Because the fundamental issue is the same as in the School District case—whether a competitive bidding procurement scheme was properly followed—the reasons underlying the court's finding of public importance apply with equal force in the instant case. Resolution of this issue will likely have an impact on government practices beyond the confines of the case itself. Greenville County and other public entities must be accountable under the laws and regulations which govern how they spend public money. Allowing interested citizens a right of action in our judicial system when issues are of significant public importance ensures this accountability and the concomitant integrity of government action.

For these reasons, we find the trial court correctly ruled Sloan had standing to pursue this declaratory judgment action.

### B. Mootness

The County argues this case is not justiciable because the issues presented are moot. We disagree.

In general, this court may only consider cases where a justiciable controversy exists. *See Byrd v. Irmo High Sch.*, 321 S.C. 426, 430, 468 S.E.2d 861, 864 (1996). "A justiciable controversy is a real and substantial controversy which is ripe and appropriate for judicial determination, as distinguished from a contingent, hypothetical or abstract dispute." *Pee Dee Elec. Coop., Inc. v. Carolina Power Light Co.*, 279 S.C. 64, 66, 301 S.E.2d 761, 762 (1983). Moot appeals differ from unripe appeals in that moot appeals result when intervening events render a case nonjusticiable. *Curtis v. State*, 345 S.C. 557, 567, 549 S.E.2d 591, 596 (2001). This Court will not pass on moot and academic questions or make an adjudication where there remains no actual controversy. *Byrd*, 321 S.C. at 431, 468 S.E.2d at 864 (citing *Jones v. Dillon–Marion Human Res. Dev. Commn.*, 277 S.C. 533, 291 S.E.2d 195 (1982)); *see also Charleston County Sch. Dist. v. Charleston County Election Commn.*, 336 S.C. 174, 180, 519 S.E.2d 567, 570–71 (1999) (quoting *Byrd*). A case becomes moot when judgment, if rendered, will have no practical legal effect upon [the] existing controversy. This is true when some event occurs making it impossible for [the] reviewing Court to grant effectual relief. *Curtis*, 345 S.C. at 567, 549 S.E.2d at 596 (quoting *Mathis v. South Carolina State Highway Dept.*, 260 S.C. 344, 346, 195 S.E.2d 713, 715 (1973)). The function of appellate courts is not to give opinions on merely abstract or theoretical matters, but only to decide actual controversies injuriously affecting the rights of some party to the litigation. Accordingly, cases or issues which have become moot or academic in nature are not a proper subject of review. *Wallace v. City of York*, 276 S.C. 693, 694, 281 S.E.2d 487, 488 (1981).

In the civil context, there are three general exceptions to the mootness doctrine. First, an appellate court can take jurisdiction, despite mootness, if the issue raised is capable of repetition but evading review. Second, an appellate court may decide questions of imperative and manifest urgency to establish a rule for future conduct in matters of important public interest. Finally, if a decision by the trial court may affect future events, or have collateral consequences for the parties, an appeal from that decision is not moot, even

though the appellate court cannot give effective relief in the present case.

*Curtis,* 345 S.C. at 568, 549 S.E.2d at 596 (citations omitted).

██ Despite an issue's mootness, an appellate court may decide questions of imperative and manifest urgency to establish a rule for future conduct in matters of important public interest. *Curtis v. State,* 345 S.C. at 568, 549 S.E.2d at 596. The seminal case in our state defining this exception to the mootness doctrine is *Ashmore v. Greater Greenville Sewer District,* 211 S.C. 77, 44 S.E.2d 88 (1947). In *Ashmore,* the plaintiff sought to enjoin a government body from issuing bonds to fund the construction and maintenance of a new auditorium. *Id.* at 85, 44 S.E.2d at 91. The trial court denied the request for injunction. *Id.* An election was held in which the voters approved the sale of bonds, thereby rendering the issue moot. *Id.* The court nevertheless decided the case was justiciable because the issues raised were of substantial public importance, opining:

If this were an ordinary case, our opinion might well stop here. . . . But the case is not an ordinary one; it is not a private controversy between individuals, as such. On the contrary, it is defended by an intended governmental agency which the legislature undertook to create by their enactments; and raised on the record are earnestly argued public questions of importance. The last stated factor brings into play the principle, now generally established, that questions of public interest originally encompassed in an action should be decided for future guidance, however abstract or moot they may have become in the immediate contest.

*Id.* at 96, 44 S.E.2d at 96–97; *see also Berry v. Zahler,* 220 S.C. 86, 89, 66 S.E.2d 459, 461 (1951) (reaffirming the exception to the rule of rejection without decision of academic questions articulated in *Ashmore* ); *People ex rel. Wallace v. Labrenz,* 411 Ill. 618, 622, 104 N.E.2d 769, 772 (1952) (Among the criteria considered in determining the existence of the requisite degree of public interest are the public or private nature of the question presented, the desirability of an authoritative determination for the future guidance of public officers, and the likelihood of future recurrence of the question.); 20

Am.Jur.2d *Courts* 47 (2003) ( [C]ourts may decide moot issues or cases where such a decision would be in the public interest).

In our discussion of Sloan's standing to bring this action, this court has already found in an analogous case that the "expenditure of public funds pursuant to a competitive bidding statute is of immense public importance." *Sloan*, 342 S.C. at 524, 537 S.E.2d at 303. The same rationale applies with respect to mootness. There is a keen public interest in the stewardship of public funds and a strong need to provide guidance for future procurement decisions. Our inability to provide any effective relief in this case should not be a barrier to the courts consideration of this question of exceptional public interest.

This court may take jurisdiction of a case, "despite mootness, if the issue raised is capable of repetition, but evading review." *Curtis*, 345 S.C. at 568, 549 S.E.2d at 596; *see also Byrd*, 321 S.C. at 431–32, 468 S.E.2d at 864 (clarifying that South Carolina recognizes an exception to the mootness doctrine allowing the court to retain jurisdiction when an issue is capable of repetition, yet evading review); *Treasured Arts, Inc. v. Watson*, 319 S.C. 560, 564, 463 S.E.2d 90, 92 (1995) (Under the mootness doctrine of capable of repetition yet evading review, a case is not rendered moot when a challenged action was in its duration too short to be fully litigated prior to its completion and there was a reasonable expectation that the same complaining party would be subjected to the same action again.); *South Carolina Dep't of Mental Health v. State*, 301 S.C. 75, 76, 390 S.E.2d 185, 185 (1990) ( [A]lthough the issue presented was moot, "appeal was allowed because it raises a question that is capable of repetition, but which usually becomes moot before it can be reviewed"); *Evans v. South Carolina Dep't of Soc. Servs.*, 303 S.C. 108, 110, 399 S.E.2d 156, 157 (1990) (addressing a moot question because the controversy presents a "recurring dilemma" which needed clarification for future guidance); 1 Am.Jur.2d *Actions* 50 (2003) (noting the general rule that "courts will not decide moot questions is subject to an exception where the question, though moot, is ... likely to recur and evade judicial resolution in the future"). The party bringing the action need only show the issue raised is *capable* of repetition and is not required to prove there is a "reasonable expectation" the issue

will arise again. *Byrd,* 321 S.C. at 431–32, 468 S.E.2d at 864 (finding South Carolina has adopted the "lenient" approach to evading review analysis).

We find the present case presents an issue that is likely to recur but evade review. By design, the procurement code's exception allowing use of design-build source selection accelerates the process of awarding public works contracts and the ultimate completion of the projects themselves. Sloan initiated the actions in the present case within one week after the contracts were executed or the County's written determination was filed. Nevertheless, construction on all three projects was complete prior to the beginning of trial in this case. Because the fundamental inquiry in this case concerns the validity of using an expedited procurement process, it is improbable similar challenges can navigate the litigation process before the question becomes a purely academic one.

For these reasons, we find a justiciable controversy exists in the present case despite the mootness of the questions presented.

## II. SUFFICIENCY OF THE WRITTEN DETERMINATIONS

Having found Sloan's claims to be properly reviewable by this court, we review whether the written determinations published by the County are sufficient under the Greenville County Code. The County's decision to use design-build source selection rather than the traditional competitive sealed bidding method is discretionary. G.C.C. § 7–242.5(a). The Code provides little guidance, however, as to what the County should consider when making its decision—couching its directives in the most general terms: "In exercising such discretion, the county administrator or his designee shall consider the method which is the most advantageous to the county and will result in the most timely, economical, and successful completion of the construction project." *Id.*

In reviewing the discretionary decision of a legislative body, our courts have been loath to substitute their judgment for that of elected representatives. Such decisions "should not be upset on appeal unless [they are] arbitrary, unreasonable, in obvious abuse of discretion, or in excess of lawfully delegat-

ed power." *Smith v. Georgetown County Council,* 292 S.C. 235, 238–39, 355 S.E.2d 864, 866 (Ct.App.1987) (citing *Bob Jones Univ. v. City of Greenville,* 243 S.C. 351, 133 S.E.2d 843 (1963)); *see also* 62 C.J.S. *Municipal Corporations* § 196(b) (1999) (commenting that "discretionary action on the part of a municipality is subject to judicial review where the action is manifestly arbitrary or discretion is clearly abused").

Our review must be guided by the express legislative intent underlying Greenville County's procurement code:

> It is the intent of the county council that the primary concern of county government be the effective provision of services to the citizens of the county in the most efficient and economical way possible, and that all purchases of goods and services needed to provide these services be conducted with primary concern for the efficient and economical use of revenues provided by those citizens.

G.C.C. § 7–192. Included among the "underlying purposes and policies" of the procurement ordinances, is the direction to "promote increased public confidence in the procurement regulations, procedures, and practices used by this county," "maximize the purchasing value of public funds," and "provide safeguards for maintaining a procurement system of quality and integrity." § 7–192(b)(2), (3) & (6).

In light of the Code's express mandate and guiding policy, it is apparent the written determination required under section 7–242.5 must serve a dual function: The determination must first effectively inform county council of the reasons why design-build source selection works to the County's best advantage for the project at issue. Equally important, the determination must provide the citizens of Greenville County a window into the County's decision-making process—safeguarding the quality and integrity of the contract awards through public accountability. If the written determination provides sufficient factual grounds and reasoning for the County Council and the public to make an informed, objective review of these decisions, then it has accomplished its purpose.

Bearing these twin aims in mind, we examine each of the written determinations for the Roads 2000, Roads 2001, and Forensics Lab projects.

## A. Roads 2000 Determination

The written determination to use design-build source selection for the Roads 2000 project was prepared by Gerald Seals, the Greenville County Administrator from 1993 to 2000. Seal's determination addresses the County Council's time, budget, and quality requirements and sets forth the project-specific reasons why design-build rather than traditional competitive sealed bidding procurement serves to better meet the County's goals.

The determination first addressed the Roads 2000 project's particular time and budget requirements. Seals described how the special, expedited road paving needs outlined by the Prescription for Progress plan significantly exceeded the County's timeline and budget capacity for road improvements. He also noted that, less than four months before the date of this determination, the County Council reaffirmed its commitment to the Prescription for Progress program and "its goal and commitment to improve County roads by 2010."

Given these requirements, Seals concluded the design-build method of source selection would best address the County Council's mandate under the Prescription for Progress program that extensive road improvements be completed rapidly while not affecting any other County services. Seals cited his particular experience using the design-build method in past projects: "These projects were fast-tracked and let using the [design-build] procurement method to satisfy tight time schedules, quality and budget requirements." Seals then offered several reasons why traditional low-bid, competitive sealed bidding procurement would hinder the County's ability to achieve its project objectives. He noted:

> Low bid is a slower process that [will] require[ ] the County [to] subdivide the varied aspects of the 1999–2000 Road Improvement Program into specific and disparate sections and individually solicit a low bid for each service component and each individual road. It should be noted that the 1999–2000 Road Improvement Program encompasses more than one-hundred (100) roads. Broad service components include: general engineering, specific individual engineering of each of the one-hundred roads included in the program, quality control, drainage inspection and engineering, inspec-

tions, and paving. Individualized low bid solicitation for each road and/or service components means that completing the 1999–2000 Road Improvement Program would likely take more than one (1) year, not the twelve (12) months mandated by County Council.

Additionally, Seals found that "[s]trict low bid procurement solicitation does not eliminate bid rigging or fraud" and can result in "low ball bidding" in which the vendor who submitted the lowest bid "knowingly or as a result of inexperience, increases the actual contract using change orders or refusing to proceed until the government corrects its program by increasing the contract." He stated: "The factors for analysis under low bid procurement [are] limited—specifically, the ability to analyze a vendor's history of change orders due to the submission of unrealistically low bids, or vendor's actual history of performance track record, is restricted" and that "[l]ow bid procurement will require excessive staff time and thus adversely affect other services, such as pothole and drainage repair."

 We find this determination provided ample grounds to support the County Council's decision to approve use of the design-build method. It addressed the specific needs of the project and weighed the alternative methods for procuring construction services, providing the County Council and interested members of the public clear insight into the rationale underlying its decision to use design-build. Accordingly, the trial court properly ruled this determination was sufficient under section 7–242.5.

### B. Roads 2001 Determination

The written determination for the Roads 2001 project was prepared by John Hansley, who was serving at the time as acting county administrator. Hansley sets forth a detailed basis for the decision to use design-build.

As with the Roads 2000 determination, this determination addressed the special challenges presented by the extensive, expedited roads improvement program called for under the Prescription for Progress plan. Hansley affirmed: "The department is faced with budget limitations, increased workloads, three major construction projects and seven designs of

projects, as well as a one-year timeframe for the program coupled with overlapping roadwork and special projects from the previous fiscal year."

To meet the goals of the road improvement program for 2001, Hansley made project-specific findings that additional staff would need to be hired to ensure proper engineering, quality control, and inspection for the various components of the project if the County used the traditional procurement methods. The determination contains specific projections of these additional costs which Hansley estimated would total over a million dollars.

Hansley discussed the County's past success using design-build source selection for large, complex and expedited construction projects. The determination provided specific details about past projects in the form of comprehensive empirical evidence showing six design-build construction contracts where the project was completed on time and on budget. Hansley concluded:

> Additionally, the County has utilized this process [design-build] since the inception of the Prescription for Progress Road Program in 1997. In my opinion, it can be firmly stated that the competitive proposal method has proven to be valuable to the County.
>
> ... Thus, the public/private partnership will afford the County an opportunity to continue its commitment to providing optimal public services. At the same time, the aggressive road improvement program will continue to meet Council's expectations.

The determination addressed the project-specific needs of the County, the County's previous experience with design-build, and a comparison of the alternative methods. An ample factual basis therefore exists, supporting the conclusion that design-build source selection "should benefit the County by allowing it to accomplish its goals and deadlines in a timely manner, while providing day-to-day services to citizens." The County Council and the public were well served by Hansley's written determination, and the trial court correctly ruled it satisfied the requirements of section 7–242.5.

### C. Forensics Lab Determination

██ The written determination for the Forensics Lab project was prepared by Rick Brookey, the facilities project manager for Greenville County. The entire determination is limited to a single paragraph, and reads:

> Due to the nature of this project (no detailed defined scope of work), it is the opinion of Public Services that this project will best be served using the turn key/design build methodology. Also, due to the budget (already established & approved) and having both, contractor and architect as a team, this approach will give the project the best opportunity to get the most value for the needed renovation for our budget. Having a team consisting of a contractor, architect and user groups, will be the most feasible way to get a defined scope of work and succeed in accomplishing the user's needs within the budget and time frame for this project.

The County argues this determination is sufficient because it addressed the critical "issues related to time, money and quality." We disagree.

Brookey's written determination stands in stark contrast to the determinations prepared by Seals and Hansley for the Roads 2000 and 2001 projects. The Forensics Lab determination merely sets forth three conclusory statements that are unsupported by any factual grounds related to the renovation project. The determination does not discuss the disadvantages of using the traditional competitive sealed bidding method for this project, nor does it discuss the advantages of the design-build with any degree of specificity.

We conclude that the Forensics Lab determination fails to provide any reasoned basis for the decision to use design-build source selection. It does not provide sufficient detail to allow the County Council and the public to make an intelligent review of the decision. The trial court was therefore correct in finding this determination inadequate under section 7–242.5.

### III. ADMISSIBILITY OF EVIDENCE REGARDING THE WRITTEN DETERMINATIONS

██ Sloan argues the trial court erred by allowing the County to present evidence regarding the written determina-

tions for the use of the design-build method of source selection. We disagree.

At trial, the court heard testimony from Gerald Seals and John Hansley, both of whom served as county administrators during the time the construction contracts were awarded and were responsible for preparing the written determinations required by section 7–236. The focus of their testimony moved from matters specific to the projects at issue in this case to areas of general background information, drawing on the sum of their experience working with government procurement. Seals and Hansley described the factors they considered in making the determinations that design-build should be used for the construction projects. Their testimony extended beyond the confines of the text of the written determinations they submitted to the County Council: Seals and Hansley also described their decision-making process—how they arrived at these determinations—at times walking the court through the steps they followed in deciding that design-build was the best fit for these projects. They discussed some of the problems encountered when using the competitive sealed bidding process in earlier projects and some of their past successes using the design-build method.

Sloan argues, by allowing testimony beyond a narrow inquiry related to the specific content of the written determinations, the trial court permitted the County to supplement and bolster those determinations. As proof that this evidence was improperly admitted and should not have been considered, Sloan points to portions of the trial court's order where the court apparently relies on this testimony in reaching its conclusion that the Roads projects were properly justified by the written determinations. Sloan cites several examples in the trial court's Roads 2001 and Roads 2000 orders: In the "Facts" section of the Roads 2001 order, the trial court specifically discussed Seals' and Hansley's testimony regarding the County's "great success" in using the design-build method in earlier construction projects. The court stated that Hansley "conduct[ed] a thorough review of the project" in making his determination to use the design-build method. In the Roads 2000 order, the trial court reviewed in its "Facts" section Seals' testimony recounting his positive past experience using the design-build method.

562

In support of his argument that the testimony was improperly admitted, Sloan relies exclusively on two cases: *Piedmont Natural Gas Co., Inc. v. Hamm*, 301 S.C. 50, 389 S.E.2d 655 (1990) and *Parker v. South Carolina Public Service Commission*, 288 S.C. 304, 342 S.E.2d 403 (1986). We find this authority inapposite.

Both *Piedmont Natural Gas* and *Parker* stand for the rule that after a case has been remanded by an appellate court, a party cannot submit additional evidence unless the appellate court has given leave to do so. *See Piedmont Natural Gas*, 301 S.C. at 54, 389 S.E.2d at 657 (holding the supreme courts remand to the Public Service Commission to substantiate the record was a direction to the Commission merely to review the evidence which was already contained in the record, not to hold a new hearing for the admission of additional evidence); *Parker*, 288 S.C. at 307, 342 S.E.2d at 405 (finding the supreme court's remand of an issue to the Public Service Commission for "further consideration" did not permit the Commission to entertain additional evidence not already contained in the record). The rationale for this rule is straightforward: "no party may afford itself two bites at the apple." *Parker*, 288 S.C. at 307, 342 S.E.2d at 405.

The present case does not concern the admission of additional evidence upon remand from an appeal. Quite the contrary, the question before us is whether the trial court overstepped its authority by entertaining evidence at trial—the parties' "first bite" at the apple.

■■■ We find the evidence admitted was material and probative to the trial court's inquiry into the sufficiency of the County's written determination. Part of the function of presenting evidence at trial is to educate the finder of fact as to the surrounding circumstances giving rise to the narrow issues raised. There is no question that there was much that was outside the expectable realm of knowledge of the trial court judge. Government procurement and its guiding policies are unfamiliar territory to all but a few. Collateral or background information presented by way of testimonial, documentary, and demonstrative evidence would be necessary to fill in the gaps of understanding. This type of information is an important part of the trial court's process of educating itself: "In

addition to evidence that bears directly on the issues, leeway is allowed even on direct examination for proof of facts that merely fill in the background of the narrative and give it interest, color, and lifelikeness." 1 *McCormick on Evidence* § 185 (5th ed.1999).

We conclude the trial court did not err in admitting the complete testimony of Seals and Hansley.

## IV. ROADS 2000 BONDING

■■■ The County argues the trial court erred in ruling the County failed to obtain the appropriate payment and performance bonds for the Roads 2000 project. We disagree.

Section 7–238 of the County Code provides "[w]hen a construction contract is awarded in excess of twenty-five thousand dollars ($25,000.00)" a "performance bond" and a "payment bond" "shall be delivered to the county and shall become binding on the parties upon the execution of the contract." Each of these bonds "shall be in an amount equal to one hundred (100) percent of the price specified in the contract." G.C.C. § 7–238.

The total amount of compensation agreed upon under the contract for the Roads 2000 project was $6,759,100. The County, however, obtained a bond for only $4,666,000, the amount listed as the "total construction budget" in an exhibit attached to the contract. The additional $2,093,100 covered the costs for engineering ($816,900), "quality assurance" ($201,-200), and "program management" ($1,075,000).

The County asserts the "price specified in the contract" under section 7–238 need not include items in the contract other than the actual, direct costs of construction. We find this argument is in error.

We look first to the language of the Code provision. The words of a statute or regulation "must be given their plain and ordinary meaning without resort to subtle or forced construction to limit or expand its operation." *Hitachi Data Sys. Corp. v. Leatherman,* 309 S.C. 174, 178, 420 S.E.2d 843, 846 (1992); *accord Durham v. United Cos. Fin. Corp.,* 331 S.C. 600, 604, 503 S.E.2d 465, 468 (1998); *Adkins v. Comcar Indus., Inc.,* 323 S.C. 409, 411, 475 S.E.2d 762, 763 (1996).

The language must also be read in a sense which harmonizes with its subject matter and accords with its general purpose. *Hitachi Data Sys.,* 309 S.C. at 178, 420 S.E.2d at 846 (citations omitted). A statute should be given a reasonable and practical construction consistent with the purpose and policy expressed in the statute. *Davis v. NationsCredit Fin. Servs. Corp.,* 326 S.C. 83, 484 S.E.2d 471 (1997); *Georgia–Carolina Bail Bonds, Inc. v. County of Aiken,* 354 S.C. 18, 22, 579 S.E.2d 334, 336 (Ct.App.2003); *Stephen v. Avins Constr. Co.,* 324 S.C. 334, 478 S.E.2d 74 (Ct.App.1996). If a statutes language is plain, unambiguous, and conveys a clear meaning the rules of statutory interpretation are not needed and the court has no right to impose another meaning. *Hodges v. Rainey,* 341 S.C. 79, 85, 533 S.E.2d 578, 581 (2000); *Paschal v. State Election Comm'n,* 317 S.C. 434, 454 S.E.2d 890 (1995); *Georgia–Carolina Bail Bonds,* 354 S.C. at 24, 579 S.E.2d at 337.

By its plain meaning, section 7–238 affords the County no discretion to deliver payment and performance bonds for any amount less than the amount specified in the contract. There is no limiting language which would indicate the provision was intended to apply only to the portion of the contract price specifically related to the cost of construction.

The County's procurement code is remedial in nature, and its provisions should be construed liberally to carry out its purposes. *See South Carolina Dep't of Mental Health v. Hanna,* 270 S.C. 210, 213, 241 S.E.2d 563, 564 (1978) ("A remedial statute should be liberally construed in order to effectuate its purpose."); *Spencer v. Barnwell County Hosp.,* 314 S.C. 405, 408, 444 S.E.2d 538, 540 (Ct.App.1994) ("In considering a remedial act designed to protect a class of persons or the public at large, the courts liberally construe the act to carry out its purposes."). Because the express purpose of the procurement code is to ensure the "efficient and economical use of revenues" provided by the taxpayers (§ 7–192), the bonding requirements of section 7–238 should be read to afford the greatest protection to the citizens of Greenville County.

We are bolstered in our reading of section 7–238 by evidence presented at trial regarding the general industry practice concerning the delivery of performance and payment

bonds. Included in the record before the court is an industry publication, *Design–Build RFQ/RFP Guide for Public Sector Projects*. Under the heading "Contract Bond Must Include Design," this guide instructs the government procurer to:

Indicate to the proposers that the contract bond (performance and payment bond) must cover the entire contract between the owner and the design-builder, including any and all necessary professional architectural and engineering services. The bond must not be limited to construction value and associated risks.

Expert testimony was also presented which confirms that the general practice in the field of public procurement is to obtain bonds for the full amount of the contract price, inclusive of design and other non-construction cost items.

We conclude the language of section 7–238, supported by evidence regarding industry practice, clearly requires the delivery of performance and payment bonds for the full amount of the contract price, not simply the contract costs for construction alone. The trial court, therefore, correctly ruled the Roads 2000 project was not properly bonded.

## V. SUFFICIENCY OF FORENSICS LAB CONTRACT

█ Sloan argues the Forensics Lab contract fails to comply with section 7–240(a) of the County Code because the County failed to append the contract with a project scope, payment schedule, or project schedule. We disagree.

Section 7–240 provides: "All contracts for . . . construction shall include provisions necessary to define the responsibilities and rights of the parties to the contract." Based on our review of the contract, we find this standard was met. Although no additional documents were attached to the original contract further defining the project scope, payment schedule, or project schedule, the contract was sufficiently definite to "define the responsibilities and rights of the parties to the contract."

With respect to the project scope, construction drawings were developed for the project, reflecting in substantial detail the project scope contemplated by the design-build team. The contract also incorporated by reference the Request for Proposal criteria used to solicit design-build team proposals, providing a further indication of the planned project scope.

The contract also contains sufficient details regarding compensation and terms of payment. Article 3.1 provides that the price of the contract shall not exceed $290,000. Additionally, Article 4.1 addresses the terms of payment—outlining in substantial detail when the contractor is required to submit payments each month and the timeframe in which the County must make payments.

Finally, while the contract does not provide a comprehensive project schedule, it does contain a 120–day completion schedule. We conclude, therefore, that the contract is sufficiently definite to "define the responsibilities and rights of the parties."

## CONCLUSION

We find the trial court ruled correctly with respect to all of the issues presented: The case was properly justiciable. The written determinations to use design-build source selection for the Roads 2000 and Roads 2001 projects were sufficient under the Code, while the determination prepared for the Forensics Lab project was not. The trial court did not err by admitting witness testimony regarding the written determinations. The County did not obtain sufficient performance and payment bonds for the Roads 2000 project. Finally, the trial court correctly found the Forensics Lab contract was sufficient under the Code. Accordingly, the rulings of the trial court are

**AFFIRMED.**

GOOLSBY and CONNOR, JJ., concur.