**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

Timothy J. Judy and Dana A. Judy, Respondents,

v.

Alice Soto, Joseph B. Rodriguez, Matthew Rodriguez, Gwen Rodriguez and Stephanie B. Wells, Appellants.

Appellate Case No. 2023-000436

———————

Appeal From Orangeburg County
James B. Jackson, Jr., Master-in-Equity

———————

Unpublished Opinion No. 2024-UP-257
Heard June 12, 2024 – Filed July 17, 2024

———————

**AFFIRMED**

———————

Matthew Tillman, Esquire of Womble Bond Dickinson, LLP, of Charleston, for Appellants.

Michael Pinckney Horger, Sr., of Michael P. Horger, LLC, of Orangeburg, for Respondents.

———————

**PER CURIAM:** This case arises from a dispute over ownership of a sliver of land between property owned by Timothy and Dana Judy (collectively, the Judys) and property owned by Alice Soto. Soto and the other Appellants assert the master-in-

equity erred in finding the Judys own the disputed area. Appellants further challenge the master's injunction requiring them to remove fence wiring and then prohibiting them from entering the area. We affirm.

**Facts and Procedural History**

The Disputed Property lies between two parcels on Sleepy Hollow Road in Orangeburg; one owned by the Judys (Lot 14), and one owned by Soto (Lot 1). The Disputed Property is labeled Parcel A in a survey Soto obtained:



Both Lot 1 and Lot 14 were formerly owned by Lawrence Stroman, who inherited many acres of land in Orangeburg and Calhoun Counties upon his father's death. In 1951, Stroman conveyed Lot 1, described as "approximately one acre of land," to Dewey Edwards, who was married to Stroman's daughter, Betty. This property was described as:

> ALL that certain piece, parcel or lot of land, situate, lying and being in New School District No. 7, County of Orangeburg, State of South Carolina, containing about one (1) acre, more or less, and located near the Calhoun-Orangeburg County line, on a highway which connects State Highway No. 176 and U.S. Highway 301, and being bounded as follows: on the North and East by lands of Kennerly's Estate; on the South by other lands of the

grantor herein, Lawrence E. Stroman; and on the West by the said highway.

In 1974, Stroman conveyed sixty-one acres partially bordering Lot 1 to Betty. This property was described as:

All that certain piece, parcel or tract of land, with the buildings and improvements thereon, containing sixty-one (61) acres, more or less, of which twenty-three (23) acres, more or less, is situate, lying and being in Orange Township, School District No. 2, County of Orangeburg, State of South Carolina, and thirty-eight (38) acres, more or less, is situate lying and being in Lyons Township, School District No. 2, County of Calhoun, State of South Carolina, and the entire tract is bounded as follows: On the North by lands now or formerly of Moody Rast; on the East by S.C. Highway No. 468, lands now or formerly of Bardin, lands now or formerly of Kennerly, lands now or formerly of Dantzler, lands now or formerly of Kennerly, and lands now or formerly of Edwards; on the South by lands now or formerly of Kennerly, lands now or formerly of Edwards, and lands now or formerly of Dantzler, and on the West by lands now or formerly of Dantzler and lands now or formerly of Evans. Being the same tract of land devised to L. Edgar Stroman by Lewis A. Stroman who died testate in the County of Orangeburg, S.C., on February 6, 1938, and the Will of Lewis A. Stroman and the proceedings of estate are recorded in the office of the Judge of Probate for Orangeburg County, S.C., in Apartment 254, Package 12.

Between 2000 and 2009, various interests in Lot 1 were transferred among Dewey, Betty, and their daughter, Janet Gaillard. In August 2009, Gaillard conveyed all of her interest in Lot 1 to Dewey and Betty. Dewey and Betty then obtained a loan secured by Lot 1, which included their residence and approximately one acre surrounding the house.

On May 9, 2016, Dewey and Betty conveyed Lot 1 to Champion Mortgage Company via a deed in lieu of foreclosure.  Champion Mortgage sold Lot 1 to Soto on May 27, 2016.

In 2018, Kevin Edwards, Dewey and Betty's son, arranged for Betty to exchange some real property, Lot 14, for renovation work Timothy Judy performed on a property Kevin was preparing to sell.  This deed was recorded on March 16, 2018.

In 2020, the Judys sued Soto for slander of title, conversion, and intentional infliction of emotional distress; the Judys further sought injunctive relief to prevent Soto and others from entering their property.  Soto answered and counterclaimed for trespass.  In 2022, Soto asserted additional counterclaims for conversion and to quiet title in response to the Judys' amended complaint.  Soto claimed she acquired title to the Disputed Property from Champion Mortgage in 2016 and asked that the court declare her the owner of the parcel.

At the hearing before the master, Timothy Judy testified he acquired his primary residence on Sleepy Hollow Road from Kevin Edwards.  Judy later acquired Lot 14 (1.32 acres across the street from his primary residence) from Kevin's mother, Betty.  Judy noted Appellant Rodriguez put up wiring after Soto learned Judy was having the area surveyed.  Soto knew Judy was obtaining the survey because he told her he was acquiring the property from Betty and proposed making their property lines straighter.  When Soto responded that she was not interested in straightening the lines, Judy went forward with the survey and then "left the line as [Don Smith] surveyed it"—along an old ditch line between Lots 1 and 14.  The ditch is now covered, and "the property line is actually on top of the culvert pipes or the drainage pipes from the road culvert all the way to the ditch in the back of the woods."  Judy noted that he planted shrubbery along the property line delineated by surveyor Smith; he also identified a 2017 tax office aerial photo of the property showing the property line running from the culvert down the ditch line.  Judy acknowledged he was aware of a potential dispute over another .2 acres between his shrubbery and Soto's home but stated he did not dispute ownership of this area because it did not bother him.  Betty had quitclaimed any interest she had in that small area over to Soto, and Judy made no claim to that property.

Kevin testified his parents mortgaged Lot 1, which contained their residence and approximately one surrounding acre; he further explained Lot 1 was separated from the Edwards's larger, pasture property by the old ditch line.  Kevin's grandfather granted his parents "one (1) acre, more or less" on which to build their home, and historically, that property line was the ditch line.  Kevin testified that

although his father legally owned Lot 1 and his mother owned Lot 14, they used both properties together as one farm, and he grew up in the house on Lot 1. The dividing line was not an issue until the current dispute, and Kevin admitted he was unaware of any historical deed or survey referencing the ditch as the property line.

Kevin testified the deed in lieu transferring Lot 1 from his parents to Champion Mortgage would have included his parents' house and the acre surrounding it, with the property line running along the old ditch as it always had. Kevin identified this as the same property Champion sold to Soto. He noted the quitclaim deed from his mother to Soto did not include any of the Judys' property and addressed a tiny parcel of land on the northeast side between Lots 1 and 14.

Kevin believed the parcels were never surveyed because his parents also owned the surrounding property. Kevin asked Smith to survey the lots when he arranged to trade some of his mother's land to Timothy Judy in exchange for Judy's work on a house Kevin owned. Kevin told Smith that Soto's property should have been the approximately one-acre containing the house; he also told Smith that Soto wanted her property to look like the tax map. Kevin testified Smith followed the culvert along the old ditch line separating the home property—Lot 1—from the pasture property—Lot 14—in finding the property line. Kevin identified the line on Smith's survey as the old ditch line separating the two properties. He noted the aerial photos from 2007 and 2017 do not match because they show different property lines. He explained the difference in the maps appeared to be on the back side of the property the Judys claimed to own—with it being a triangle rather than a four-sided parcel. Kevin stated there had been previous issues with aerial surveys from the tax assessor's office being inaccurate, such as listing the wrong owner on a map after a different purchaser bought forty-one acres across the street.

Kevin hired an attorney to prepare documentation for the transfer of Lot 14 from Betty to the Judys; he testified he was unaware of the subsequent quitclaim deed between Betty and Soto until after this litigation began.

On cross-examination, Kevin admitted he previously listed Lot 1 for sale, but he did not recall advertising the property as two acres. Thus, Soto sought to admit the prior Zillow listing into evidence. The Judys successfully objected, arguing the listing was irrelevant because at the time of that listing, Betty still owned *all* of the property and could sell as many of her acres as she chose.

Soto testified she moved to Orangeburg in 2016 to buy a home for her retirement. She recalled a conversation with Kevin in which he wanted "to make sure that I

knew that beyond the picket fence, I owned nothing." On cross-examination, Soto testified Kevin told her she did not own anything beyond her own link fence, which ran parallel to her home along the back side of the property. She denied ever having a conversation with Kevin or with Timothy Judy about the property line between Lots 1 and 14, but she admitted she asked a surveyor to prepare a plat for her. In her opinion, both her surveyor and Judys' surveyor were "incorrect."

The master found the property line between Lot 1 and Lot 14 is the old ditch line, and the Judys own the Disputed Property. The master noted he considered extrinsic evidence in determining the boundary line because he could not ascertain Lawrence Stroman's intent when he conveyed property to Dewey Edwards in 1951, or when he later conveyed property to Betty in 1974. The master recognized the purpose of the various aerial photographs was to identify property for county tax purposes, not to establish legal title. He found Kevin's testimony most persuasive because Kevin had been familiar with both properties for over fifty years. The master further held the quitclaim deed could not have transferred ownership of the Disputed Property to Soto because Betty executed it after she had already conveyed Lot 14 to the Judys. The master noted Soto seemed more concerned with the property line along the roadway in front of her house—rather than the line between Lots 1 and 14—and she "offered no evidence of what she understood was the boundary on the disputed side."

The master ordered Soto to remove the encroaching wiring and fence posts within thirty days. The order further provides that after this thirty-day period, Appellants are prohibited from entering the Disputed Property. Failure to comply with the terms of the order subjects an offending party to contempt, with potential penalties of imprisonment for up to one year and/or a fine of up to one thousand dollars.

**Standard of Review**

> Normally, an action to quiet title to property is an action in equity. However, the character, as legal or equitable, of an action is determined by the complaint in its main purpose, the nature of the issues as raised by the pleadings or the pleadings and proof, and the character of the relief sought under them.

*Jones v. Leagan*, 384 S.C. 1, 10, 681 S.E.2d 6, 11 (Ct. App. 2009).

"A boundary dispute is an action at law and the location of a disputed boundary line is a question of fact." *Jordan v. Judy*, 413 S.C. 341, 347, 776 S.E.2d 96, 100 (Ct. App. 2015) (quoting *Bodiford v. Spanish Oak Farms, Inc.*, 317 S.C. 539, 544, 455 S.E.2d 194, 197 (Ct. App.1995)). "In an action at law tried without a jury, the appellate court will not disturb the trial court's findings of fact unless there is no evidence to reasonably support them." *Nationwide Mut. Fire Ins. Co. v. Walls*, 433 S.C. 206, 212, 858 S.E.2d 150, 153 (2021) (quoting *Bell v. Progressive Direct Ins. Co.*, 407 S.C. 565, 576, 757 S.E.2d 399, 404 (2014)). "However, an appellate court may make its own determination on questions of law and need not defer to the trial court's rulings in this regard." *Id.* (quoting *S.C. Farm Bureau Mut. Ins. Co. v. Kennedy*, 398 S.C. 604, 610, 730 S.E.2d 862, 864 (2012)).

## I.  Ownership of the Disputed Property

Appellants contend the master erred in failing to ascertain the intent of the original grantor of Lot 1, in basing his ruling entirely on Kevin's testimony, and in declining to admit Kevin's prior Zillow listing.  We disagree.

> When determining boundaries, resort is generally had first to natural boundaries, next to artificial monuments, then to adjacent boundaries, and last to courses and distances.  This rule, however, merely indicates the weight generally given to each type of evidence of location.  The rule does not provide an order of admissibility, such that evidence of artificial boundaries is admissible only if there is no evidence of natural boundaries.  The rules for determining disputed boundaries are not inflexible, but are subject to modification depending upon the particular facts of each case.  The facts of a case may therefore require that an inferior means of location be preferred over a higher means of location.

*Danley Williams v. Moore*, 400 S.C. 90, 103–04, 733 S.E.2d 224, 231 (Ct. App. 2012) (internal citations omitted) (quoting *Bodiford*, 317 S.C. at 544 n.1, 455 S.E.2d at 197 n.1).

Here, the record contains evidence supporting the master's finding that the old ditch line is the property line between Lots 1 and 14.  Kevin's testimony supports

this finding, and Soto recognized the Edwards family's knowledge of the property boundaries when cross-examining Judy:

> Q. And regarding any prior use of the boundaries between the property Ms. Soto claims and the property you claim, the best person to talk about that would be the former owners which would be the Edwards family; correct?
>
> A. Uh-huh.
>
> Q. And you agree with that?
>
> A. Yes.

Kevin's testimony is compelling because he was most familiar with the property: he grew up in the house on Soto's property, and the surrounding land had been in his family for decades. The deed conveying Lot 14 to the Judys indicates Lot 14 was part of the larger tract Stroman conveyed to Betty in 1974. Kevin explained the house property—Soto's Lot 1—was approximately one acre, and it was divided from the larger, pasture property by the ditch line. Moreover, we note that a ditch, even though now covered, is akin to a natural boundary, and this court gives great weight to natural boundaries in determining property boundaries. *See Danley Williams*, 400 S.C. at 104, 733 S.E.2d at 231 (recognizing that in disputes over property boundaries, the most weight is given to "to natural boundaries, next to artificial monuments, then to adjacent boundaries, and last to courses and distances" (quoting *Bodiford*, 317 S.C. at 543 n.1, 455 S.E.2d at 197 n.1)). As the ditch is now covered, the master gave proper weight to the culvert—an artificial monument—in his boundary analysis. *See id.* At the hearing before the master, Appellants provided no conclusive evidence of any boundary to support their argument that Soto owns the Disputed Property.[1] Accordingly, we affirm the master's findings that the property boundary is the old ditch line and that the Judys own the Disputed Property.

---

[1] Like the master, we reject the historical tax maps as conclusive evidence for purposes of this boundary dispute. The tax maps were prepared for municipal tax purposes, not to establish dispositive boundaries; at least one of the aerial maps purporting to depict this area conflicts with others; and testimony established prior county tax map inaccuracies such as listing the wrong owner of a nearby parcel.

## II.  Injunction

Appellants next assert the master erred in granting the Judys an injunction requiring Appellants to remove encroaching wiring and fence posts and then enjoining them from entering the Disputed Property.  As Appellants' only argument on this point is that the injunctive relief is predicated on an erroneous ownership finding, we decline to further address this issue.  *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (recognizing an appellate court need not address remaining issues when resolution of a prior issue is dispositive).

## III.  Contempt of Court Penalty

Finally, Appellants contend the master violated their constitutional rights by issuing a prospective criminal sanction without finding any order had been violated.  Appellants assert they "have the right to defend themselves, and to contest actual contempt charges."  However, no party has been found to be in contempt.  The master's order merely provides the potential sanctions Appellants *could* face should they violate the court's order—any constitutional issue that might arise during a potential contempt proceeding is hypothetical at this point.  Thus, this issue is not ripe for review.  *See Colleton Cnty. Taxpayers Ass'n v. Sch. Dist. of Colleton Cnty.*, 371 S.C. 224, 242, 638 S.E.2d 685, 694 (2006) (holding "an issue that is contingent, hypothetical, or abstract is not ripe for judicial review"); *Encore Tech. Grp., LLC v. Trask*, 436 S.C. 289, 309, 871 S.E.2d 608, 619 (Ct. App. 2021) ("An argument is not ripe if it is contingent on future events."); *Sloan v. Greenville County*, 356 S.C. 531, 552, 590 S.E.2d 338, 349 (Ct. App. 2003) ("The function of appellate courts is not to give opinions on merely abstract or theoretical matters, but only to decide actual controversies injuriously affecting the rights of some party to the litigation.").

## Conclusion

Based on the foregoing, the order of the master in equity is

**AFFIRMED.**

**THOMAS, MCDONALD, and VERDIN, JJ., concur.**