# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Elizabeth Murray as Personal Representative of the
Estate of Minnie H. Murray and Elizabeth Stylesetters,
Appellants,

v.

The Estate of William E. Murray, Respondent.

Appellate Case No. 2018-001680

Appeal from Charleston County
Jennifer B. McCoy, Circuit Court Judge
Tamara C. Curry, Probate Court Judge

Opinion No. 5890
Heard April 15, 2021 – Filed January 19, 2022

**AFFIRMED**

George J. Kefalos, of George J. Kefalos, PA; Oana
Dobrescu Johnson, of Oana D. Johnson, Attorney at Law;
and Barry I. Baker, of Baker & Varner, LLC, all of
Charleston; and Stephen Michael Slotchiver, of
Slotchiver & Slotchiver, LLP, of Mount Pleasant, all for
Appellants.

Robert H. Hood and Mary Agnes Hood Craig, of Hood
Law Firm, LLC, both of Charleston; Jean Marie
Jennings, of Charleston; and Deborah Harrison Sheffield,
of Columbia, all for Respondent.

**LOCKEMY, A.J.:**  Appellants Elizabeth Murray, as personal representative of the Estate of Minnie H. Murray (Mother's Estate), and Elizabeth Stylesetters (Stylesetters) (collectively, Appellants) appeal the circuit court's ruling affirming the probate court's order granting summary judgment in favor of the Estate of William E. Murray (Murray's Estate).  Appellants argue the circuit court erred in finding that (1) Mother's Estate lacked standing to bring its claim against Murray's Estate, (2) the statute of limitations and laches barred Mother's Estate's claim, and (3) judicial estoppel barred Stylesetters' claim.  We affirm.

## FACTS AND PROCEDURAL HISTORY

William E. Murray (Murray) and Minnie Murray (Mother) were married in the State of New York.  The couple had three daughters: Pamela Murray[1] was born in 1951; Elizabeth Murray (Elizabeth) was born in 1953; and Catherine Murray was born in 1954 (collectively, Daughters).  Mother passed away in 1967 shortly after the couple divorced.  Murray passed away on August 4, 2007.  James Ma and Hilton Smith, husband of Catherine Murray, were appointed as co-personal representatives of Murray's Estate.  Elizabeth filed two creditor's claims against Murray's Estate on June 3, 2008: the first claim was for $6,260,845.70 on behalf of Mother's Estate, and the second claim was for $538,034.00 on behalf of Elizabeth's business, Stylesetters.

During their marriage, Mother pledged personal securities as collateral for a loan of $142,685 to Murray.  Murray acknowledged this debt as valid and owing when the parties divorced in March of 1967, and that debt was subsequently transferred to Mother's Estate upon her death in June of 1967.  In 1975, Elizabeth was appointed as the administrator of Mother's Estate.[2]

In 1980, Daughters, as the beneficiaries of Mother's Estate, entered an agreement with Murray (the 1980 Agreement) concerning the outstanding debt he owed to Mother's Estate.  Murray agreed the outstanding balance of the loan was $240,000.  The 1980 Agreement provided, "Daughters, [Mother's] Estate, and [Murray] wish to conclude the administration of the Estate of the late Minnie Holmes Murray, mother of Daughters and former wife of [Murray]; and thereby to establish the trust under the Will of [Mother] . . . ."  Murray acknowledged he was indebted to Mother's Estate and agreed to pay $240,000 plus interest to Mother's Estate in

---

[1] Pamela passed away during the pendency of this case.
[2] Elizabeth was appointed after the original administrator was removed for malfeasance.

yearly installments. For the years 1980, 1981 and 1982, Murray was to pay interest only, which was $19,200 per year; thereafter, he was to pay principal and accrued interest, amortized over a period of ten years. The 1980 Agreement provided the indebtedness bore interest of 8% per annum but the failure to make any payments when due would trigger an automatic increased interest rate of 12% per annum for the period of the unpaid installment. In addition, Murray agreed to maintain and pay premiums upon a $385,000 life insurance policy that was previously transferred to Mother's Estate. Murray made six payments on the debt until 1986 and made no further payments. He also stopped paying premiums on the life insurance policy.

In December 1992, Daughters reached an agreement among themselves regarding the outstanding debt. The agreement provided,

> This letter constitutes an agreement by and between Pamela Murray Stack, Elizabeth E. Murray[,] and Catherine Peronneau Murray Smith, the three beneficiaries of the Estate of Minnie Holmes Murray, Deceased, *that the total obligation owing from William E. Murray to the Estate* as outlined in a prior agreement dated April 22, 1980 between William E. Murray and the above-mentioned three beneficiaries, as well as accrued interest, penalty interest, interest owed on his loans from the New England Life Insurance policy, as well as the accrued interest thereon and other monies which may become due, *shall become community property* between Pamela Murray Stack, Elizabeth E. Murray[,] and Catherine Peronneau Murray Smith on a joint, not several basis. Any monies remitted thereon to any one or more beneficiaries shall impose and constitute liability and obligation on that beneficiary(ies) to remit a pro-rata share to the other parties to this agreement.

Smith testified in a deposition that he assisted Daughters with Mother's Estate in the weeks prior to the 1992 Agreement. The record contains letters from Smith suggesting Daughters intended to liquidate the estate when they entered the 1992 Agreement. Smith agreed that in 1995, Murray presented a financial summary to his bank and the Small Business Administration acknowledging that he owed $1.4 million to Mother's Estate. Elizabeth testified during her March 2015 deposition that although Mother's Estate made distributions in 1992, the estate only partially

liquidated its assets, and she never filed a release and discharge with the probate court.

Elizabeth wrote several letters to Murray from 1998 to 2006, in which she reminded him of the outstanding debt. The following are excerpts from Elizabeth's February 2006 letter to Murray, which Elizabeth did not discover until February 2009:

> I need you to formally certify below that you are in agreement with your original stated obligation to Mommy's Estate, . . . which is now over $5 million per the computation attached for your examination.
>
> I must have you, as soon as possible, memorialize this agreement that those monies are due, as outlined in the 1980 agreement (see attached), by you to her Estate, whether on a currently due basis or as part of debt that will be due upon your death as a valid claim to the three of us.
>
> . . . .
>
> . . . . I must ask you affirm this decades old debt owed to your first three children, which you have always stated is your intention, both legally and as our father.
>
> . . . .
>
> Thank you for making this issue one of the past and not one of the future. I love you and want the best for you for many years to come but this is both a[] legal Agreement as well as an "honor debt." I have delayed enforcing its collection in trust of your advi[c]e and counsel, and as your daughter. But this is a legal responsibility for me and I need you to respect my position as someone trusting in you to do the right thing, especially since I have followed your legal counsel with respect to my position as Executrix.

Attached to the letter was a copy of the 1980 Agreement and the payment schedule. A signature purporting to be Murray's appears at the end of the letter. Murray was diagnosed with Parkinson's disease in 2001 when he was in his seventies, and the parties dispute whether Murray in fact signed the letter as well as whether he possessed the requisite mental capacity to do so.[3]

From 1999 until 2002, Elizabeth worked for Murray at his property, the Inn at Quogue, in New York. In her deposition, Elizabeth stated she expended "hundreds of thousands of dollars and interest thereon" to pay expenses at the Inn, including renovation, delivery bills, and payroll. She contended Murray agreed to pay her, as owner of Stylesetters, $2,000 per month towards those services, and that he made monthly payments on the debt until July 2007. Smith acknowledged Murray gave Elizabeth a monthly allowance of $3,000. He stated that to his knowledge, these payments were unrelated to the alleged debt due Elizabeth from the Inn at Quogue. Elizabeth testified Murray began paying her a $3,000 monthly allowance in 2003 and continued until 2006. She stated the payments Murray made from 2006 onward included $2,000 per month toward the Inn at Quogue debt.

Elizabeth asserted that a letter dated July 21, 2007,[4] evidenced Murray's agreement to repay her for her expenditures at the Inn of Quogue. In the July 21, 2007 letter, which Murray purportedly wrote and signed, Murray stated,

> Elizabeth is to receive the principal sum of $117[,000] plus accrued credit card and cash line of credit interest from proceeds upon the sale of the Inn at Quogue . . . .
>
> Such payments shall be for items purchased by her for or . . . used by the Inn, cash advances used to support payroll and emergency expenses related to her work there, [and] her past due payroll for design work . . . .
>
> I have made various payments from my personal account at a rate of $2,000 per month, which payments began in January[] 2006.

---

[3] These disputed facts are not at issue on appeal.
[4] The heading of the letter reflects the date June 21, 2007; however, the letter reflects the witnesses—Larry Bump and Jeffrey Young—witnessed Murray's signature on July 21, 2007. Bump and Young both testified they witnessed Murray sign the letter on July 21, 2007.

Murray's Estate filed notices of disallowance of claim as to the claims of both Mother's Estate and Stylesetters, and Appellants subsequently filed a petition for allowance of claim for both claims. After a lengthy discovery, Murray's Estate moved for summary judgment on October 31, 2016. The probate court heard the motion in July 2017 and took the matter under advisement. Thereafter, the probate court granted summary judgment in favor of Murray's Estate.

First, the probate court found Mother's Estate lacked standing because any obligation due under the 1980 Agreement was due to Daughters jointly and not to Mother's Estate. The probate court reasoned Daughters agreed to transfer the debt to themselves jointly in the 1992 Agreement, and Elizabeth stated in her 2013 affidavit that all obligations due under the 1980 Agreement were community property between Daughters. Second, the court found the claims of Mother's Estate were barred by the statute of limitations pursuant to section 15-3-530 of the South Carolina Code (2005)[5] and 62-3-802 of the South Carolina Code (Supp. 2020)[6] because Murray last paid on the debt on February 24, 1986. Moreover, the probate court concluded the February 9, 2006 letter did not revive the debt because it was not a clear and explicit promise to pay the debt or an unqualified and unequivocal admission that the debt was still due. Third, the court found Mother's Estate's claims were barred by the doctrine of laches. Finally, as to Stylesetters' claim, the probate court found it was judicially estopped from making this claim based up on a position Elizabeth took in a 2006 action involving a trust. Appellants appealed to the circuit court, which affirmed the probate court's grant of summary judgment for the same reasons the probate court provided. This appeal followed.

**ISSUES ON APPEAL**

1. Did the circuit court err by finding Mother's Estate did not have standing to prosecute its claim against Murray's Estate based upon an agreement among Daughters as to how they would divide the proceeds due to Mother's Estate?

2. Did the circuit court err by concluding Mother's Estate's claim was barred by the statute of limitations or the doctrine of laches?

---

[5] (providing the statute of limitations for "an action upon a contract, obligation, or liability, express or implied" is three years).
[6] (providing "no claim which was barred by any statute of limitations at the time of the decedent's death shall be allowed or paid").

3. Did the circuit court err by granting summary judgment as to Stylesetters' claim based on a theory of judicial estoppel?

## STANDARD OF REVIEW

> When reviewing a grant of summary judgment, appellate courts apply the same standard that governs the trial court under Rule 56(c), SCRCP, which provides that summary judgment is proper when there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law.

*S.C. Pub. Interest Found. v. S.C. Dep't of Transp.*, 421 S.C. 110, 117, 804 S.E.2d 854, 858 (2017). "This Court reviews all ambiguities, conclusions, and inferences arising in and from the evidence in a light most favorable to the non-moving party below." *Id.*

## LAW AND ANALYSIS

### A. Mother's Estate

### 1. Standing

Mother's Estate argues the circuit court erred by concluding the 1992 Agreement constituted a transfer of the debt from Mother's Estate to Daughters. Mother's Estate contends Daughters agreed among themselves as to how they would hold the proceeds of the claim once it was liquidated and did nothing to transfer ownership of the claim from Mother's Estate to themselves or change the real party in interest. We agree.

"A plaintiff must have standing to institute an action." *Sloan v. Greenville County*, 356 S.C. 531, 547, 590 S.E.2d 338, 347 (Ct. App. 2003). "Standing refers to a party's right to make a legal claim or seek judicial enforcement of a duty or right." *Bank of Am., N.A. v. Draper*, 405 S.C. 214, 219, 746 S.E.2d 478, 480 (Ct. App. 2013) (quoting *Powell ex rel. Kelley v. Bank of Am.*, 379 S.C. 437, 444, 665 S.E.2d 237, 241 (Ct. App. 2008)).

> To have standing . . . one must be a real party in interest.
> A real party in interest is one who has a real, material, or

substantial interest in the subject matter of the action, as opposed to one who has only a nominal or technical interest in the action.

*Sloan*, 356 S.C. at 547, 590 S.E.2d at 347 (omission in original) (quoting *Charleston Cnty. Sch. Dist. v. Charleston Cnty. Election Comm'n*, 336 S.C. 174, 181, 519 S.E.2d 567, 571 (1999)). Rule 17(a), SCRCP provides:

> (a) Real Party in Interest. Every action shall be prosecuted in the name of the real party in interest. An executor, administrator, guardian, bailee, trustee of an express trust, a party with whom or in whose name a contract has been made for the benefit of another, or a party authorized by statute may sue in his own name without joining with him the party for whose benefit the action is brought; and when a statute so provides, an action for the use or benefit of another shall be brought in the name of the State. No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed, after objection, for ratification of commencement of the action by, or joinder or substitution of, the real party in interest; and such ratification, joinder, or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest.

"[T]he burden of compliance with Rule 17(a) and its real party in interest requirement falls to the plaintiff." *Fisher ex rel. Estate of Shaw-Baker v. Huckabee*, 422 S.C. 234, 241, 811 S.E.2d 739, 742 (2018). "Under ordinary circumstances, the Probate Code grants the personal representative the exclusive authority to bring civil actions . . . on behalf of an estate." *Id.* at 238, 811 S.E.2d at 741. "The requirement of standing is not an inflexible one." *Draper*, 405 S.C. at 220, 746 S.E.2d at 481 (quoting *Sloan v. Sch. Dist. of Greenville Cnty.*, 342 S.C. 515, 524, 537 S.E.2d 299, 304 (Ct. App. 2000)).

As an initial matter, in its August 15, 2014 order, the probate court recognized Elizabeth as the appointed foreign personal representative of Mother's Estate pursuant to sections 62-4-204 and 62-4-205 of the South Carolina Code (Supp. 2020). Murray's Estate has not challenged this, and therefore Elizabeth was authorized to maintain actions on behalf of Mother's Estate in South Carolina. *See*

S.C. Code Ann. § 62-3-703(c) (Supp. 2020) ("[A] personal representative of a decedent domiciled in this State at his death has the same standing to sue and be sued in the courts of this State and the courts of any other jurisdiction as his decedent had immediately prior to death."); § 62-4-204 ("[A] domiciliary foreign personal representative may file with a court in this State in a county in which property belonging to the decedent is located, authenticated copies of his appointment and of the will, if any."); § 62-4-205 ("A domiciliary foreign personal representative who has complied with Section 62-4-204 may exercise as to assets (including real and personal property) in this State all powers of a local personal representative and may maintain actions and proceedings in this State . . . .").

Although the record contains a document that Daughters signed purporting to relieve Elizabeth as personal representative, the record does not indicate this document was ever filed with the probate court of New York. Elizabeth testified Mother's Estate remained active, that the 1992 distribution only partially liquidated the estate, and that she was never released as personal representative. The evidence therefore indicates Mother's Estate was never closed. The 1992 Agreement was among Daughters, and Mother's Estate was not a party to that agreement. We do not believe the 1992 Agreement transferred the debt from Mother's Estate to Daughters. Rather, Murray's obligation to pay the debt was an obligation to Mother's Estate, and Mother's Estate retained the right to enforce the debt and was therefore the real party in interest. Accordingly, we conclude Mother's Estate, and Elizabeth, as personal representative of Mother's Estate, had standing to bring the claim.

## 2. Statute of Limitations

Mother's Estate argues the question of whether Murray reaffirmed the debt was a question of fact and the circuit and probate courts erred by deciding such question as a matter of law. Specifically, Mother's Estate contends the question of whether Murray intended for his signature on the February 9, 2006 letter to show his intent to repay the debt was a question of fact. It asserts the letter "explicitly asked Mr. Murray to acknowledge the debt was still owed and that it would be paid." We disagree.

In the February 9, 2006 letter, Elizabeth asked Murray to certify that he was in "agreement with [his] original stated obligation to M[other]'s Estate." She also wrote,

> I must have you, as soon as possible, memorialize this agreement that those monies are due, as outlined in the 1980 agreement (see attached), by you to her Estate, *whether on a currently due basis or as part of debt that will be due upon your death* as a valid claim to the three of us.

In affirming the probate court's order, the circuit court assumed for purposes of summary judgment that Murray signed the February 9, 2006 letter. The circuit court found that as a matter of law the letter did not constitute a new promise to pay the debt. Although the parties dispute the authenticity of his signature—and whether he was competent to sign such a document at the time—these questions are not at issue on appeal.

"Actions to recover debts in South Carolina must generally be brought within three years of the default on the debt. This bar only effects the remedy available to a collecting party rather than the underlying right: it does not erase the debt." *In re Vaughn*, 536 B.R. 670, 677 (Bankr. D.S.C. 2015) (citation omitted); *see also* § 15-3-530. "No acknowledgment or promise shall be sufficient evidence of a new or continuing contract whereby to take the case out of the operation of this statute unless it be contained in some writing signed by the party to be charged thereby." S.C. Code Ann. § 15-3-120 (2005). However, "payment of any part of principal or interest is equivalent to a promise in writing." *Id.*

"Whether an instrument purporting to be an acknowledgment of a debt is sufficient to take it out of the bar of the statute of limitations is a question for the court, but whether the debt sued for is the one acknowledged is a question for the jury." *Hill v. Hill*, 51 S.C. 134, 140, 28 S.E. 309, 312 (1897) (quoting 1 *Thomp. Trials* § 1268).

"After the statute [of limitations] has run out, there must be 'an express promise to pay, or an admission of a subsisting debt which the party is willing and liable to pay.'" *Horlbeck v. Hunt*, 26 S.C.L. (1 McMul.) 197, 200-01 (1841). "[I]f there be an unequivocal admission, that [the debt] is due and unpaid, unaccompanied by any expression, declaration, or qualification, indicative of an intention not to pay, the state of facts on which the law implies a promise, is then present, and the party is bound by it." *Id.* at 201 (quoting *Young v. Monpoey*, 18 S.C.L. (2 Bail. 280) 278 (1830)); *see also Suber v. Richards*, 61 S.C. 393, 403, 39 S.E. 540, 543 (1901) (stating the writing must "recognize an existing debt . . . [and] should contain nothing inconsistent with an intention on the part of the debtor to pay it" (quoting

*Manchester v. Braender*, 14 N.E. 405, 406 (N.Y. 1887)).  "Such new promise . . . must amount to an unqualified admission of a subsisting legal liability and must be established by evidence unambiguous and full."  *Black v. White*, 13 S.C. 37, 40 (1880).

In *Horlbeck v. Hunt*, the court found no implied promise to pay the debt when the defendant debtor acknowledged he owed the debt but stated he could not pay it and that it would have to "come in with his other debts."  26 S.C.L. at 197-98.  The court reasoned that although the debtor admitted the debt was due and unpaid, such admission was "accompanied by a plain expression that the [debtor] did not intend to pay, when he said 'he could not pay,' and when he declined [an] . . . offer to settle by note or bond on his own time.'"  *Id.* at 201.  The court concluded the debtor's other observation that the debt "must come in to be paid with [his] other debts" was "no undertaking to pay it" but simply meant the debt must "take its chance for payment with [his] other debts."  *Id.* at 201.  Viewing the debtor's statements as a whole, the court found that although "the defendant admitted that the debt once was due, and might once have been paid, . . . he declined to admit either his liability or willingness to pay."  *Id.* at 201.

In *Hill*, the appellate court concluded statements a debtor made in letters he wrote to his creditors were sufficient to imply a new promise to pay.  51 S.C. at 141, 28 S.E. at 312.  The debtor wrote four separate letters to his creditors, and expressed in each letter his intention to repay the debt, offering notes and real estate securities to satisfy the debt.  *Id.* at 140-41, 28 S.E. at 311.  In the final letter he stated, "[D]o not understand me to say that I do not mean to pay, for I expect to pay every dollar of it."  *Id.*  The court concluded the letters constituted an "unqualified and unequivocal admission that a debt [wa]s still due, unaccompanied by any expression indicative of an intention not to pay, as would imply a promise to pay."  *Id.* at 140-41, 28 S.E. at 312.

In *Black v. White*, our supreme court held an administrator's mere inclusion of a debt upon the inventory of his intestate's estate did not constitute "an unqualified admission of a subsisting legal liability."  13 S.C. at 40-41.  Similarly, applying South Carolina state law, the bankruptcy court in *In re Vaughn*, concluded that the mere listing of a debt as a claim on her bankruptcy schedules was insufficient to imply a new promise to pay such that the statute of limitations did not bar the debt. 536 B.R. at 677-79.

Here, although the 2006 letter identified the specific debt and acknowledged the debt was "due," it then stated Murray owed the debt to Mother's Estate "whether on

a currently due basis or as part of debt that will be due upon [Murray's] death as a valid claim to [Daughters]."  A statement that the debt was either currently due or alternatively would be due upon Murray's death was not an unequivocal admission the debt was due.  Although Murray did not expressly refuse to pay the debt, he essentially just established options, which was inconsistent with an intention to repay it.  *See Suber*, 61 S.C. at 403, 39 S.E. at 543 (stating the writing must "recognize an existing debt . . . [and] should contain nothing inconsistent with an intention on the part of the debtor to pay it" (quoting *Manchester*, 14 N.E. at 406)).  Such language merely suggests this debt must simply take its chances with other debts.  *See Horlbeck*, 26 S.C.L. at 201 (finding the debtor's observation that the debt "must come in to be paid with [his] other debts" was "no undertaking to pay it" but simply meant the debt must "take its chance for payment with [his] other debts."); *Black*, 13 S.C. at 40-41 (holding an administrator's mere inclusion of debt upon the inventory of his intestate's estate did not constitute "an unqualified admission of a subsisting legal liability"); *In re Vaughn*, 536 B.R. at 678 (applying South Carolina state law on debt revival and stating "a mere acknowledgement of a debt as a debt that will be paid in accordance with other debts does not revive the debt").  Moreover, the letter indicated the debt was due "both legally and as our father" and referred to the debt as an "honor debt."  These statements were equivocal because by signing the letter, Murray seems to have acknowledged only a moral obligation and not a legal one to repay this debt that is now over two decades old.  Because the letter contained equivocal language and an expression that was inconsistent with Murray's intent to repay the debt, we find this letter was insufficient to demonstrate an unequivocal admission that the debt was due and unpaid.  Accordingly, we affirm the circuit court's grant of summary judgment in favor of Murray's Estate as to this issue.

## 3. Laches

Mother's Estate contends laches is an equitable defense that does not apply to a legal claim to collect on a debt.  On the merits, it argues any delay in asserting the claim was understandable given Daughters' relationship with Murray and the fact Smith periodically undertook to advise Daughters how to preserve the ongoing validity of the debt.  Further, Mother's Estate asserts the accrual of substantial interest was of Murray's making because he could have paid the debt at any time either before or after his death.  We find the doctrine of laches was inapplicable because this case involved a legal claim to collect on a debt.  *See Edens v. Edens*, 312 S.C. 488, 491, 435 S.E.2d 851, 852 (1993) ("The statute of limitations rather than laches applies to all legal claims against an estate.").  Rather, as we concluded, the statute of limitations barred the claims of Mother's Estate.

## B. Stylesetters

### Judicial Estoppel

Stylesetters argues Murray reaffirmed the debt and his intention to repay it in a letter dated July 21, 2007.  Stylesetters asserts the circuit court erred in concluding the viability of the claim turned on Murray's competence.  Stylesetters contends that even without the 2007 letter, the debt remained valid because Murray made payments on the debt from 2006 until May of 2007.  Sytlesetters argues the circuit court erred by finding judicial estoppel barred its claim because Elizabeth never took a position as to Murray's competency in the 2006 trust litigation and no judicial determination was made as to his competence in that action.  We disagree.

"Judicial estoppel precludes a party from adopting a position in conflict with one earlier taken in the same or related litigation."  *Hayne Fed. Credit Union v. Bailey*, 327 S.C. 242, 251 489 S.E.2d 472, 477 (1997).  "Judicial estoppel comes into play when the court is forced to take a position based on a factual assertion."  *Hawkins v. Bruno Yacht Sales, Inc.*, 353 S.C. 31, 43, 577 S.E.2d 202, 208 (2003); *see also Commerce Ctr. of Greenville, Inc. v. W. Powers McElveen & Assocs., Inc.*, 347 S.C. 545, 554 n.6, 556 S.E.2d 718, 723 n.6 (Ct. App. 2001) ("The doctrine generally applies only to inconsistent statements of fact.").

> When a party has formally asserted a certain version of the facts in litigation, he cannot later change those facts when the initial version no longer suits him. . . .  [T]he truth-seeking function of the judicial process is undermined if parties are allowed to change positions as to the facts of the case, unless compelled by newly-discovered evidence.

*Hayne Fed. Credit Union*, 327 S.C. at 252, 489 S.E.2d at 477 (footnote omitted).

"The purpose of the doctrine is to ensure the integrity of the judicial process, not to protect the parties from allegedly dishonest conduct by their adversary."  *Cothran v. Brown*, 357 S.C. 210, 215, 592 S.E.2d 629, 631 (2004).  It "is an equitable concept and should be applied sparingly, with clear regard for the facts of the particular case.  The application of judicial estoppel must be determined on a case-by-case basis, and must not be applied to impede the truth-seeking function of the court."  *Id.* at 216, 592 S.E.2d at 632.

[T]he following elements [are] necessary for the doctrine to apply: (1) two inconsistent positions taken by the same party or parties in privity with one another; (2) the positions must be taken in the same or related proceedings involving the same party or parties in privity with each other; (3) the party taking the position must have been successful in maintaining that position and have received some benefit; (4) the inconsistency must be part of an intentional effort to mislead the court; and (5) the two positions must be totally inconsistent.

*Id.* at 215-16, 592 S.E.2d at 632. "[T]he term 'privity,' when applied to a judgment or decree, means one so identified in interest with another that he represents the same legal right." *Carrigg v. Cannon*, 347 S.C. 75, 80, 552 S.E.2d 767, 770 (Ct. App. 2001) (alteration in original) (quoting *Ex parte Allstate Ins. Co.*, 339 S.C. 202, 207, 528 S.E.2d 679, 681 (Ct. App. 2000)).

In 2006, Elizabeth was involved in litigation in New York pertaining to Murray's position as trustee of the Samuel Freeman Charitable Trust (the Trust Litigation). Elizabeth and her sister Pamela filed a verified answer and cross-petition, alleging the following: "Over the past several years [Murray]'s physical and mental competency have become severely impaired. As of this date he is unable to fully focus upon, understand, and deal with basic and fundamental business and financial matters. Accordingly, he is regrettably no longer able to fulfill the duties of Chairman of the Trust." Elizabeth additionally alleged Murray "lacked and lacks the requisite mental capacity to intelligently and knowingly execute a document that purported to remove [her] . . . as a Trustee." She claimed "[he] suffered a significant stroke" and was involved in a "major automobile accident" in 1992 and that these incidents were followed by a series of "mini-strokes" that left his "mental capacities increasingly impaired." Elizabeth further alleged he suffered another stroke in 1999, further impairing his ability to reason, use simple vocabulary, and recall the names of people and places. She stated that subsequently in 2003, due to the effects of Parkinson's syndrome, he became increasingly unable to verbalize his thoughts and intentions and that his condition had deteriorated even further. Specifically, Elizabeth asserted that in August 2003 he was a in a state of confusion about dates, times, events, and places. The probate court concluded Stylesetters' claim, which was based on the July 2007 letter, was judicially estopped based on Elizabeth's statements regarding Murray's capacity in her verified answer and cross-petition. The probate court also noted Elizabeth

alleged Murray lacked capacity in a July 2007 guardianship proceeding, however, the petitioner named on that document was Pamela, not Elizabeth.

We find the circuit court did not err in affirming the probate court's application of judicial estoppel.  As to the first element, Elizabeth and Stylesetters were in privity with one another.  Elizabeth brought the creditor's claim against Murray's Estate on behalf of her business, Stylesetters.  Elizabeth testified Stylesetters was a sole proprietorship "doing business as" itself.  Elizabeth Stylesetters and Elizabeth Murray, therefore, are not distinct entities.  *See Moore v. Moore*, 360 S.C. 241, 259, 599 S.E.2d 467, 476 (Ct. App. 2004) ("Because Appellant's business was a sole proprietorship, he and his business were not distinct entities."); *Auto-Owners Ins. Co. v. Rhodes*, 405 S.C. 584, 600, 748 S.E.2d 781, 789 (2013) (noting a "sole proprietorship form of business provides complete identity of the business entity with the proprietor himself" (quoting *Bushey v. N. Assurance Co. of Am.*, 766 A.2d 598, 603 (Md. 2001))).  Elizabeth took two inconsistent positions: in the Trust Litigation, she claimed Murray lacked competence to remove her as trustee and that his competency steadily declined over a period of years leading up to that litigation; in this case, she claims that only eight months later he was competent to acknowledge a debt of more than $100,000.  Therefore, the first element of judicial estoppel is met.

As to the second element, the Trust Litigation involved Elizabeth, and as we stated, Elizabeth and Stylesetters were in privity.  Although this case and the Trust Litigation involved different types of claims, both cases presented a question of fact concerning Murray's competence and how his competence or lack thereof affected the conduct at issue.  There, it was Murray's decision to remove Elizabeth as trustee.  Here, it was his recognition of an agreement to repay a substantial debt to Elizabeth's business.  In either case, Murray's competence would have been a significant issue in a trial on the merits.  Therefore, we find the second element of judicial estoppel is met.

As to whether Elizabeth was successful in maintaining an inconsistent position in the related litigation and received a benefit, we find this element was met.  Although the Trust Litigation settled and there was no judicial determination as to Murray's mental capacity, Elizabeth was reinstated as trustee and therefore received a benefit.  Therefore, we find the third element of judicial estoppel is met.

Next, the record shows the inconsistency was part of an intentional effort to mislead.  Stylesetters argues it never took a position on Murray's competency in the Trust Litigation.  Because of the relationship between Elizabeth and

Stylesetters, this claim is disingenuous and suggests an intentional effort to mislead the court. In her answer and cross-petition in the Trust Litigation, Elizabeth stated Murray's "mental competency" had "become severely impaired" over the last several years. She stated he was "unable to fully focus upon, understand, and deal with basic and fundamental business and financial matters" as of the date of that filing, which was November 17, 2006. She made several additional representations concerning his mental faculties in that pleading. For example, she asserted, "any purported removal of Elizabeth as a trustee was ineffective as a matter of law on the ground, among others, that [Murray] lacked and lacks the requisite mental capacity to intelligently and knowingly execute a document that purported to remove [her] as trustee." In this case, she asserts Murray had capacity to agree to repay her hundreds of thousands of dollars in July 2007 notwithstanding her allegations that his mental competency had steadily declined in the years leading up to November 2006. This demonstrated an intent to mislead the court because Elizabeth and her business advanced whichever factual position was most advantageous to their claims in each case. Accordingly, we find the fourth element of judicial estoppel is met.

Finally, the positions were totally inconsistent. The periods in question were closely related in time. In the November 17, 2006 pleading, Elizabeth claimed Murray had suffered from the effects of Parkinson's syndrome since 2003 and had become "increasingly unable to verbalize thoughts and intentions." She alleged his condition continued to deteriorate thereafter and he was particularly susceptible to the undue influence of Smith. Elizabeth sought an order declaring the documents Murray signed purporting to remove her as trustee were "ineffective and void on the ground that [he] lacked mental capacity to exercise such a function as Chairman of the Trust and were the product of improper and undue influence exercised by [Smith] over [Murray]." In this case, Stylesetters claims that about eight months later, and a few weeks prior to his death, Murray was competent to acknowledge a debt of hundreds of thousands of dollars. Because of the overlapping periods and issues of competency, the positions Elizabeth and Stylesetters took in these two cases were totally inconsistent.

Finally, although Stylesetters asserts that even excluding the July 21, 2007 letter, Murray affirmed the debt when he continued to make monthly payments on such debt until July 2007, neither the circuit court nor the probate court addressed this issue in their orders granting summary judgment. We believe Stylesetters failed to preserve any argument that Murray affirmed the debt by making the $3,000 monthly payments because it failed to file a Rule 59(e), SCRCP, motion seeking a ruling on that issue. *See Wilder Corp. v. Wilke*, 330 S.C. 71, 77, 497 S.E.2d 731,

734 (1998) ("Post-trial motions are . . . used to preserve those [issues] that have been raised to the trial court but not yet ruled upon by it.").

Based on the foregoing, we conclude the circuit court did not err by granting summary judgment in Murray's Estate's favor as to Stylesetters' claim based on the doctrine of judicial estoppel.

## CONCLUSION

For the foregoing reasons, the circuit court's order affirming the probate court's grant of summary judgment in favor of Murray's Estate as to the claims of Mother's Estate and Stylesetters is

**AFFIRMED.**

**HEWITT, J., and HUFF, A.J., concur.**